2010 UT 46

**Ronnie Lee GARDNER, Petitioner and Appellant,**

v.

**STATE of Utah, Respondent and Appellee.**

**No. 20100436.**

Supreme Court of Utah.

June 14, 2010.

Andrew Parnes, Ketchum, ID, Megan B. Moriarty, Therese M. Day, Salt Lake City, for petitioner.

Mark L. Shurtleff, Att'y Gen., Thomas B. Brunker, Erin Riley, Asst. Att'ys Gen., Salt Lake City, for respondent.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 In 1985, Ronnie Lee Gardner was convicted of first degree murder and sentenced to death. For the past twenty-five years, his execution has been stayed pending resolution

of his state and federal post-conviction appeals. The most recent of those actions was finally resolved on March 8, 2010, when, after fifteen years of federal court review, the United States Supreme Court declined to review the decision of the Tenth Circuit Court of Appeals. On March 10, 2010, the State applied for an execution warrant so that it could carry out Mr. Gardner's sentence; the warrant was issued shortly thereafter. After that warrant was issued, Mr. Gardner filed this Petition for Post–Conviction Relief in district court.[1] The petition contains constitutional challenges to Mr. Gardner's sentence that he did not raise in any prior proceeding. The State moved for summary judgment on all of Mr. Gardner's claims on the grounds that the claims are barred under the statutes governing post-conviction relief both because the claims are untimely and because Mr. Gardner had an opportunity to raise the claims in a prior proceeding and failed to do so. The district court agreed with the State's arguments and granted the State's motion for summary judgment.

¶ 2 Mr. Gardner appeals from the district court's order granting summary judgment in favor of the State.[2] He argues that the district court incorrectly assessed his ability to bring his claims prior to the conclusion of his federal action and that, consequently, the court erred in concluding that his claims were barred. Mr. Gardner also argues that the district court had authority to make an exception to the rules that bar his claims, and that it erred in failing to exercise that authority because not reviewing the merits of the claims will result in egregious injustice. We agree with the district court's conclusion that Mr. Gardner's claims could have been raised in prior proceedings many years ago. We also conclude that Mr. Gardner has failed to demonstrate any injustice that would re-

quire us to set aside the statutory and procedural rules that control judicial review of his claim. Therefore, we affirm the district court's grant of summary judgment in favor of the State.

## BACKGROUND

¶ 3 Our recitation of the facts and procedural history of this case draws liberally from the federal magistrate judge's Report and Recommendation in Mr. Gardner's federal habeas corpus petition, the Tenth Circuit's decision in Mr. Gardner's federal habeas corpus appeal, and our own decisions in Mr. Gardner's prior appeals to this court. Because Mr. Gardner's claims in this petition center on the sufficiency of the process he has been afforded and the evidence considered by the courts that have reviewed his claims, and given the profound importance of the issues involved, we set forth the background of this case in some detail.

## I. THE MURDER OF MICHAEL BURDELL

¶ 4 Mr. Gardner has been sentenced to death for the murder of Michael Burdell, an attorney Mr. Gardner shot and killed while attempting to escape from prison custody at a Salt Lake City courthouse. On April 2, 1985, Mr. Gardner was transported from the maximum security unit at the Utah State Prison to the Metropolitan Hall of Justice in Salt Lake City. Scheduled to appear in court to face charges for second degree murder, Mr. Gardner instead attempted to carry out a plan to escape from custody. As he entered the courthouse basement with his guards, a female accomplice handed Mr. Gardner a gun, which he turned on the

---

1. Mr. Gardner also appealed directly from the issuance of the warrant of execution. In that appeal he raised claims identical to the claims raised in this petition. *State v. Gardner,* 2010 UT 44, ¶ 2, 234 P.3d 1104 (per curiam). We concluded that appealing from that warrant was procedurally improper. *Id.* All of the substantive claims asserted by Mr. Gardner are being addressed in the context of this petition for post-conviction relief.

2. The district court had jurisdiction to hear Mr. Gardner's case pursuant to Utah Code section 78B–9–104 (2008). We have jurisdiction to hear this appeal pursuant to the interoperation of Utah Code section 78A–4–103(2)(f) and subsections 78A–3–102(3)(i) and –102(3)(j) (2008).

guards. Mr. Gardner and the guards exchanged gunfire and Mr. Gardner was shot in the chest and lung.[3] The guards retreated to the parking lot, and Mr. Gardner entered the archives room, looking for a way out of the building. A court clerk, a prison officer, and three attorneys were also in the archives room. Mr. Gardner said he had been "shot" and "hit bad" and went back into the lobby. When he left, two of the attorneys, Mr. Burdell and Robert Macri, attempted to hide behind the open door to the archives room. But Mr. Gardner reentered the archives room and noticed the attorneys behind the door. Mr. Gardner walked to within one-and-a-half to two feet of them, pointed the gun at Mr. Macri and cocked the hammer. Mr. Burdell exclaimed, "Oh, my God!" Mr. Gardner said, "Oh Fu—," turned the gun to Mr. Burdell, and after what one witness described as a "definite pause," fatally shot Mr. Burdell in the head. Mr. Gardner then shot Mr. Burdell a second time.

¶ 5 Mr. Gardner then forced the prison officer in the archives room to accompany him up the stairs to the second-floor lobby. As Mr. Gardner crossed the lobby, a uniformed bailiff was coming downstairs to investigate the commotion. Mr. Gardner shot and seriously wounded the bailiff and then proceeded up the stairs. On the next floor, Mr. Gardner took hostage a vending machine serviceman and forced the serviceman to accompany him outside the building. As Mr. Gardner exited the courthouse, the serviceman broke free and dived through a court service teller's window back inside the building. Once outside, Mr. Gardner, wounded, still shackled, and surrounded by police, threw down his gun and surrendered.

## II. MR. GARDNER'S TRIAL, CONVICTION, AND DEATH SENTENCE

¶ 6 At his trial for the murder of Mr. Burdell, Mr. Gardner was represented by Andrew and James Valdez of Salt Lake Legal Defenders Association. Their strategy was to argue that Mr. Gardner was under such pain and physical distress after being shot that shooting Mr. Burdell was an unintentional reaction—that it was an accident or, at most, done with reckless disregard for human life. Nevertheless, the jury convicted Mr. Gardner of first degree murder, attempted first degree murder, aggravated kidnaping, escape, and possession of a dangerous weapon by an incarcerated person.

¶ 7 At the penalty phase of the trial, the State presented evidence that Mr. Gardner "posed a continuing threat even while incarcerated and that previous attempts to deter [Mr. Gardner's] criminal behavior had failed."[4] Witnesses testified for the State about criminal behavior Mr. Gardner had engaged in *since* becoming incarcerated.[5] For instance, the jury heard testimony from twelve State witnesses that corroborated each of the following instances of conduct: Mr. Gardner escaped from the minimum security facility in 1981;[6] after his escape he stabbed and beat a man at his former sister-in-law's house without having been provoked;[7] still out of custody after escaping from prison, he instigated a shootout at a friend's house that resulted in his arrest;[8] after the shootout, he told the arresting deputy that he knew the deputy's family and would have them killed;[9] also in 1981, he attempted to escape from the medium security facility at the Utah State Prison;[10] in 1984, after an incident in medium security

---

3. *See Gardner v. Holden,* 888 P.2d 608, 612 (Utah 1994). One of Mr. Gardner's claims in his first state post-conviction relief proceeding was that his "trial counsel were ineffective because they failed to clarify for the jury that Gardner was shot in the chest and lung instead of in the shoulder." *Id.* at 616. We disposed of this claim summarily because it was frivolous. *Id.*

4. Report and Recommendation of Magistrate Judge, *Gardner v. Galetka,* No. 2:95–CV–846–TC, 2007 U.S. Dist. LEXIS 25643, at 97 (D.Utah Apr. 5, 2007) [hereinafter Magistrate Report].

5. *Id.*

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.* at 97–98

10. *Id.* at 98.

caused him to be transferred to maximum security, he attacked a member of the transporting tactical squad with a screwdriver, only complied with officers' orders after being threatened with a stun gun, and, even then, threw his head back hard, cracked an officer's nose, and kicked at the officers, bringing three of them down in the process;[11] also in 1984, upon hearing from an officer that he would be transferred to maximum security, Mr. Gardner spit in the officer's face at least three times, punched the wall, smashed his television by throwing it on the floor, and threatened to kill the officer and his children;[12] also in 1984, Mr. Gardner escaped from custody after being examined at the University Hospital by attacking his guard, knocking him down, taking his loaded gun, pointing it at his head, and forcing him to remove Mr. Gardner's restraints—all of which resulted in lost vision in one of the guard's eyes, a nose broken in sixteen places, four ruptured discs in the guard's back, and emergency surgery where physicians rebuilt the guard's eye socket from one of his ribs, placed a rod through his face to anchor his cheekbones apart, and wired the bones in his face together;[13] also during this escape, Mr. Gardner hijacked a motorcycle-riding medical student at gunpoint and forced the medical student to drive him to a nearby apartment building where, in the laundry room, Mr. Gardner took the medical student's clothes and his wallet, put on the clothes, hit the student with the gun and kicked him while he was on the ground, and rode off on the student's motorcycle;[14] in 1985, Mr. Gardner was to be booked into jail, and as the officer approached, he kneed her in the groin;[15] Mr. Gardner was responsible for the 1984 murder of Mel Otterstrom, who was tending bar at the Cheers Tavern.[16]

¶ 8 Defense counsel called six witnesses to testify in mitigation, although his trial counsel would later testify that Mr. Gardner prevented them from calling other witnesses and especially certain family members that might have presented evidence about his family background, his intellectual limitations, and possible physical and sexual abuse he suffered as a child. What the jury did hear was evidence that Mr. Gardner's older brother went to prison while they were still young; that Mr. Gardner had family problems as a child; that Mr. Gardner was taken from his home and put into state custody when he was eight or nine years old; that around that time, Mr. Gardner began missing school and inhaling ("huffing") gas; that the State moved the young Mr. Gardner from placement to placement, including stays at shelter homes, the detention center, foster homes, and the State Industrial School;[17] that the difficult living conditions endured by Mr. Gardner while at the State Industrial School would ultimately result in the school's closure;[18] that while at the State Industrial School, Mr. Gardner's resident counselor took a strong liking to Mr. Gardner, had a "special relationship" with him, and found him "real likeable," "real cooperative in the unit," "real outgoing," and "always ready to help the staff"; and that when Mr. Gardner was ten years old, his probation officer found him to be "a very charming, engaging, likeable young man," who was also cooperative and had a great deal of potential, but also suffered from a lack of parental supervision and an environmental situation that evoked empathy.[19] To dispel the potential notion the jury might have had that a life sentence might result in a fairly short prison term, defense counsel called Dennis Fuchs from the Utah Board of Pardons and Parole, who testified that of the eleven first degree murderers he had reviewed while serving on the Board, only two had received parole—one after having served twenty years in prison and the other after having served thirteen years in prison.[20]

11. *Id.*

12. *Id.* at 98–99.

13. *Id.* at 99–100.

14. *Id.* at 100.

15. *Id.*

16. *Id.* at 100–01.

17. *Id.* at 101–02.

18. *Id.* at 101.

19. *Id.* at 102–03.

¶ 9 Defense counsel also called Dr. Heinbecker, a psychiatrist, to testify regarding Mr. Gardner's mental status. Dr. Heinbecker only had twenty-four hours to prepare to testify.[21] He prepared by interviewing Mr. Gardner and Mr. Gardner's mother and brother, and by reviewing Mr. Gardner's previous medical and psychological records.[22] Dr. Heinbecker did not administer any psychological tests. He instead relied on psychological tests prepared by prison officials and others. At trial, based on Mr. Gardner's medical history and these tests, Dr. Heinbecker testified that Mr. Gardner suffered from organic brain damage, which, coupled with other mitigating circumstances explained Mr. Gardner's antisocial behavior.[23] He testified that Mr. Gardner had contracted meningitis when he was four years old and had sniffed glue and gasoline from age nine until after age thirteen—both of which can cause brain damage.[24] Dr. Heinbecker also based his opinion on the results of psychological tests that showed high scores on some parts and low scores on other parts, also evidence of brain damage.[25] Dr. Heinbecker also testified that Mr. Gardner "grew up in an unstable and impoverished environment"; that he "had been institutionalized for most of his life" and had thus "absorbed the moral values of others involved in antisocial criminal conduct"; that his "antisocial personality disorder ... might be explained genetically" because his "grandfather, brother, sister, nephew, three cousins, and two half-siblings" had all experienced trouble with the law; and that Mr. Gardner's "problems stemmed from parental neglect and inadequate parenting."[26] The State challenged this diagnosis with a psychological evaluation of Mr. Gardner by Dr. John Gill, who stated that his "findings [were] not indicative of blatant or-

ganic impairment."[27] When asked to explain Dr. Gill's statement, Dr. Heinbecker replied, "Well, you know, when he says it is not indicative of blatant organic impairment, it sounds to me like he is hedging his bets on whether there is organic impairment or not. In other words, he is saying, to me, more sophisticated testing ought to be done."[28]

¶ 10 At the end of the penalty phase, the jury unanimously found three aggravating factors: (1) Mr. Gardner knowingly created a risk of death to a person other than the person he killed; (2) Mr. Gardner committed the homicide to effect his escape from custody; and (3) Mr. Gardner had previously been convicted of two felonies involving the threat of violence to a person.[29] Ultimately, the jury sentenced Mr. Gardner to death.

## III. MR. GARDNER'S DIRECT APPEAL IS DENIED

¶ 11 On direct appeal, Mr. Gardner raised at least sixteen challenges to his conviction and sentence, including that: (1) the district court abused its discretion when it denied Mr. Gardner a change of venue; (2) the trial judge should have recused himself because he worked in the Hall of Justice where the shooting occurred; (3) Utah's death penalty scheme was unconstitutional; (4) evidence of two of his prior convictions should not have been admitted during the guilt phase of his trial; (5) he was improperly denied a challenge for cause; (6) the excessive presence of security in the courtroom denied him a right to a fair trial; (7) the trial judge violated his rights under the Confrontation Clause when he cut short recross-examination of a witness; (8) the testimony of Wayne Jorgensen, a corrections officer, about a conversation with Mr. Gardner violated Mr. Gardner's rights under *Miranda* and *Massiah;* (9) the trial court gave an erroneous jury

20. *Id.* at 85.

21. *Gardner v. Holden,* 888 P.2d 608, 613 (Utah 1994).

22. *Id.*

23. *Id.* at 618.

24. *Id.*

25. *Id.*

26. *Id.*

27. *Id.* at 618 (internal quotation marks omitted).

28. *Id.* at 618–19 (internal quotation marks omitted).

29. Magistrate Report, *supra* note 4, at 96.

instruction on the lesser offense of manslaughter; (10) the trial court erred when it gave an oral instruction that might lead jurors to believe they had to acquit Mr. Gardner of the charged offense before considering lesser-included offenses; (11) the trial court erred when it denied his motion for a directed verdict; (12) the trial court erred when it admitted, as an aggravating factor in the penalty phase, evidence of a previous homicide he had committed; (13) his sentence was not proportional to other sentences given in Utah capital cases; (14) prosecutors had allegedly engaged in several instances of misconduct; (15) he received ineffective assistance of counsel because his attorneys failed to object to testimony by Officer Jorgensen, Dr. Heinbecker, and Mr. Fuchs; and (16) his conviction resulted from impermissible cumulative error. We were "convinced that [Mr. Gardner's] constitutional rights were cautiously guarded at all phases of the proceeding" and we upheld Mr. Gardner's convictions and sentences, including his death sentence.[30] Our decision on Mr. Gardner's direct appeal issued in 1989; the United States Supreme Court denied his writ of certiorari in 1990.[31]

## IV. MR. GARDNER'S FIRST STATE PETITION FOR POST–CONVICTION RELIEF IS DENIED

¶ 12 Mr. Gardner then filed a petition for post-conviction relief in state district court.[32] The district court ruled that Mr. Gardner had been denied effective assistance of counsel because his trial counsel failed to give Dr. Heinbecker adequate time to test and evaluate Mr. Gardner and his appellate counsel failed to research and brief issues.[33] So, in 1991 the district court ruled that Mr. Gardner was entitled to a new penalty hearing and a new appeal.[34]

¶ 13 But when the State appealed and Mr. Gardner cross-appealed, we vacated the trial court's judgment.[35] We first held that six of Mr. Gardner's claims for relief could have been raised in his direct appeal but were not, so we declined to reach their merits.[36] This left two issues that we did reach: "(1) ineffective assistance of counsel at trial and on direct appeal; and (2) error in the habeas [corpus] proceeding in not appointing an investigator and an expert witness at state expense to assist Gardner in prosecuting his petition." [37]

¶ 14 First, we summarily rejected three of Mr. Gardner's ineffective assistance claims and rejected three others after reaching the merits.[38] The ineffective assistance claim relevant to the current appeal—that trial counsel was ineffective in failing to provide Dr. Heinbecker adequate time to examine Mr. Gardner psychologically—was one of the bases for the district court's vacation of Mr. Gardner's death sentence and grant of a new penalty hearing.[39] The district court held that because Dr. Heinbecker was given inadequate time to prepare, Mr. Gardner was deprived of a "satisfactory mental health evaluation" that could show evidence of "possible organic brain damage or other mitigat-

---

**30.** *State v. Gardner*, 789 P.2d 273, 288 (Utah 1989).

**31.** *Gardner v. Utah*, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 965 (1990).

**32.** *Gardner v. Holden*, 888 P.2d 608, 611 (Utah 1994).

**33.** *Id.*

**34.** *Id.*

**35.** *Id.* at 623.

**36.** *Id.* at 614 (refusing to address the following issues on the merits: "(1) error by the trial court in admitting hypnotically enhanced testimony; (2) error by the trial court in not advising Gardner of his right to remain silent and not testify; (3) violation of Gardner's right to be present at all the hearings in his case; (4) consideration by the jury of impermissible information about the victim; (5) failure to instruct the jury on all the statutory mitigating circumstances in the penalty phase; and (6) failure to instruct the jury in the penalty phase that the existence of aggravating factors had to be found beyond a reasonable doubt before they could be considered in deciding to impose the death penalty").

**37.** *Id.* at 613–14.

**38.** *See id.* at 615–17.

**39.** *See id.* at 617.

ing information." [40] But we held that "it was Gardner's burden, in the [post-conviction] proceeding, to adduce what favorable evidence could have been presented in his behalf if Dr. Heinbecker had been given more time to prepare," and that "[i]n fact, Dr. Heinbecker did not indicate that he might have produced any new evidence." [41] Because Mr. Gardner "proved no prospect of any other information of mitigating evidence," we held that Mr. Gardner was not prejudiced by "defense counsels' failure to provide more time to Dr. Heinbecker to prepare." [42]

¶ 15 Second, Mr. Gardner argued that he was entitled to state funds for expert witnesses and an investigator to aid him in his post-conviction proceedings and that denial of these funds "denied him the right to the effective assistance of counsel, due process, meaningful access to the courts, and equal protection under the law." [43] We first held that no statute at the time even guaranteed Mr. Gardner the right to state-funded *counsel* for his post-conviction proceeding, much less "to state-compensated experts and investigators." [44] We then held that there might "be extraordinary cases in which a petitioner for [post-conviction relief] might be entitled under the Utah Constitution to state-compensated counsel, expert witnesses, or investigators," but that Mr. Gardner was not so entitled because he "ha[d] not shown that he could not adequately pursue his [post-conviction] claims without appointed investigators and expert witnesses." [45] Important to this holding was our finding that "Dr. Heinbecker's testimony failed to show any possibility that further testing would have shown any mitigating facts." [46] We concluded that Mr. Gardner was not entitled to a new penalty hearing or appeal, and we vacated the district court's judgment. [47] Our decision issued in 1994; the United States Supreme Court denied certiorari in 1995. [48]

## V. MR. GARDNER FILES HIS FEDERAL HABEAS CORPUS PETITION AND EVIDENTIARY HEARINGS ARE HELD

¶ 16 In January 1997, Mr. Gardner filed a petition for writ of habeas corpus in the United States District Court for the District of Utah. [49] Mr. Gardner prepared his petition with the help of court-appointed experts and investigative services. [50] In his petition, he raised twenty-two challenges to his conviction and sentence. [51] These claims were referred to a magistrate judge for evaluation. [52]

¶ 17 The magistrate judge held evidentiary hearings on certain of Mr. Gardner's issues in September and October 1999. [53] One of the issues argued at the evidentiary hearing was whether Mr. Gardner's trial counsel was ineffective for not having given Dr. Heinbecker adequate time to prepare. [54] In these hearings, Mr. Gardner's court-appointed experts presented mitigation evidence—ostensibly evidence Dr. Heinbecker would have found had he been given adequate time to prepare during the penalty phase of the trial. Dr. Linda Gummow, a neuropsychologist, testified that she administered Mr. Gardner twenty-three tests, "including the Halstead–Reitan battery, memory tests, concentration

**40.** *Id.* (internal quotation marks omitted).

**41.** *Id.* at 617–18.

**42.** *Id.* at 619.

**43.** *Id.* at 622.

**44.** *Id.*

**45.** *Id.*

**46.** *Id.* at 623.

**47.** *Id.*

**48.** *Gardner v. Holden,* 516 U.S. 828, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995).

**49.** *See Gardner v. Galetka,* 2004 UT 42, ¶ 5, 94 P.3d 263 (recounting the background of the federal proceedings).

**50.** Magistrate Report, *supra* note 4, at 4.

**51.** *Gardner v. Galetka,* 2004 UT 42, ¶ 5, 94 P.3d 263.

**52.** *Gardner v. Galetka,* No. 2:95–CV–846–TC, 2007 WL 1071398, at *3, 2007 U.S. Dist. LEXIS 25651, at *9 (D.Utah, Apr. 5, 2007).

**53.** Magistrate Report, *supra* note 4, at 6.

**54.** *Id.* at 72–85.

tests, tests of sense of touch, motor tests, tactical tests, academic tests, and personality tests."[55] Both she and another of Mr. Gardner's experts, psychiatrist Dr. William Logan, testified that the results of these tests indicated that Mr. Gardner had suffered brain damage, which Dr. Logan characterized as being mild.[56] After speaking with Mr. Gardner about his background, both doctors also opined about the causes of his brain damage.[57] Mr. Gardner's mother drank large amounts of alcohol while she was pregnant with him.[58] She also had syphilis.[59] When Mr. Gardner was fifteen months old, he ingested Purex.[60] When he was four years old, he suffered from meningococcal meningitis.[61] He began huffing gasoline at about age five or six and continued this and other forms of huffing until he was at least eighteen.[62] When he was still young, he played with mercury his stepfather had stolen.[63] Mr. Gardner was using marijuana by age ten, abusing alcohol by age eleven, and also "abused hallucinogens, amphetamines, various opiates, barbiturates, and benzodiazepines."[64] He also experienced head trauma as a result of falling while passing out a couple of times and during physical fights, and as a result of a car accident when he was fourteen.[65] The doctors also testified that an early diagnosis of attention deficit disorder, difficulties in school, a tic that surfaced when Mr. Gardner was eight years old, and lagging bone development—characteristic of a child suffering from malnutrition or fetal alcohol syndrome—all indicated that Mr. Gardner's brain damage likely happened at an early age.[66]

¶ 18 These experts and Dr. Craig Haney, a professor of psychology at the University of California, Santa Cruz, also testified to details about Mr. Gardner's disadvantaged upbringing that might have led to emotional disturbance.[67] For instance, as a baby, Mr. Gardner lived in a home that had been condemned and padlocked by the sanitation department.[68] As a young child, Mr. Gardner's family "moved frequently, always living in environmentally deprived areas and substandard housing."[69] Mr. Gardner's parents separated when he was under a year old.[70] There was some evidence that Mr. Gardner's mother beat her children.[71] She also "neglected her children" and "spent a significant amount of time in bars and entertaining different men in her home."[72] There is also evidence that Mr. Gardner's father physically and emotionally abused him.[73] Mr. Gardner was diagnosed with enuresis (i.e., bedwetting), a possible indicator of severe emotional disturbance, at age eight.[74] His doctor at the time thought Mr. Gardner's "family was a setup for emotional stress."[75] Mr. Gardner and his brother were sexually abused by a foster parent.[76] As an adolescent, Mr. Gardner lived on the streets and worked as a prostitute.[77]

55. *Id.* at 77.

56. *Id.*

57. *Id.* at 78–79.

58. *Id.* at 78.

59. *Id.*

60. *Id.*

61. *Id.*

62. *Id.*

63. *Id.*

64. *Id.*

65. *Id.* at 78–79.

66. *Id.* at 79.

67. *Id.* at 79–80.

68. *Id.* at 80.

69. *Id.*

70. *Id.*

71. *Id.*

72. *Id.*

73. *Id.*

74. *Id.*

75. *Id.*

76. *Id.* at 80–81.

77. *Id.* at 81.

¶ 19 Dr. Gummow testified that Mr. Gardner's brain damage renders him unable "to change his plan once the plan is in action, and instead causes him to persist unwisely toward a goal."[78] She suggested that when Mr. Gardner shot Mr. Burdell, he was "functioning on automatic pilot and his rational reasoning process, or choice making process, shut[ ] off."[79] Dr. Logan added that the physical trauma from Mr. Gardner's gunshot wound, "combined with his brain damage[,] was probably the cause of him acting in a very impulsive way when he shot Burdell," and opined that Mr. Burdell's shooting was "spontaneous rather than intended."[80]

¶ 20 But Mr. Gardner's experts did not go unchallenged. The prosecutor at Mr. Gardner's trial, Robert Stott, testified that had an expert like Dr. Gummow testified on Mr. Gardner's behalf at his trial, the State would have called its own expert rebuttal witness.[81] So at the evidentiary hearing, the State called Dr. Noel Gardner as an example of how Mr. Gardner's mitigation evidence would have been rebutted at trial.[82] Dr. Gardner interviewed Mr. Gardner at the prison.[83] He said, "It was very clear to me that [Mr. Gardner] did not suffer from any major mental illness," and that, as to brain injury, "very, very mild elements present, but it certainly was not obvious, even to an experienced observer."[84] Dr. Gardner disagreed with Drs. Gummow and Logan that the results of their testing indicated brain injury. Instead, Dr. Gardner characterized any brain dysfunction as "very minimal" and testified that Mr. Gardner has antisocial personality disorder.[85] Mr. Gardner told Dr. Gardner that "he did not like to kill people unless it was necessary."[86] Dr. Gardner testified that

Mr. Gardner could have controlled his behavior when he tried to escape from the courthouse, "but, consistent with antisocial personality disorder, ... was unwilling to conform his behavior to limits."[87]

¶ 21 The State then called Dr. Stephen Golding, a forensic clinical psychologist and University of Utah professor.[88] Mr. Gardner had told Dr. Golding that before the day of the shooting and escape attempt, he had heard that the gun waiting for him at the courthouse would be larger than requested, but that Mr. Gardner "decided to go ahead with the plan because he was tired of being in prison and wanted to get out and party"; and that because he was bored and wanted to party, it "was worth the risk."[89] Based on the record and his own testing of and discussion with Mr. Gardner, Dr. Golding concluded that Mr. Gardner is "very much the opposite of impulsive" because he "does what he wants to do when he wants to do it for reasons that he wants."[90] Dr. Golding also testified that Mr. Gardner "is by no means ... impulsive in the sense of out of control."[91]

¶ 22 Dr. Golding diagnosed Mr. Gardner with antisocial personality disorder "in both the personality sense and in the behavioral sense."[92] As an example of this diagnosis, Dr. Golding cited Mr. Gardner's refusal to take responsibility for Mr. Burdell's death; Mr. Gardner instead blamed Officer Hensley, one of his guards, for being "a coward and back[ing] away when he saw that [Mr. Gardner] had a gun" instead of forcing Mr. Gardner to the ground so that "no one would have gotten hurt."[93] Dr. Golding also questioned

78. *Id.*

79. *Id.*

80. *Id.*

81. *Id.*

82. *Id.* at 82.

83. *Id.*

84. *Id.* (internal quotation marks omitted).

85. *Id.* (internal quotation marks omitted).

86. *Id.*

87. *Id.*

88. *Id.* at 83.

89. *Id.* at 83–84.

90. *Id.* at 83 (internal quotation marks omitted).

91. *Id.* (alteration in original).

92. *Id.*

93. *Id.* at 83–84.

the reliability of Dr. Gummow's tests as indicators of the kind of brain damage from which she claimed Mr. Gardner suffered, arguing, for instance, "that the Wisconsin Card Sorting Test has been found not to be a good indicator of frontal lobe damage."[94] Dr. Golding concluded that although Mr. Gardner may have had genetic vulnerabilities, he was "not compelled to do things in the sense that he ha[d] no choice."[95]

¶ 23 Finally, Dr. Jonathon Pincus, a neurologist for the State, further called into question the reliability of Dr. Gummow's test results.[96] He testified that neuroimaging failed to show any damage to Mr. Gardner's frontal lobes.[97] Further, Dr. Pincus testified that Mr. Gardner told him that he "constantly—even now—thinks of escaping from prison."[98]

## VI. THE MAGISTRATE JUDGE ENTERS A REPORT AND RECOMMENDS DENIAL OF MR. GARDNER'S HABEAS CORPUS PETITION

¶ 24 After the evidentiary hearings partially outlined above, briefing by both parties, and oral argument, the magistrate judge issued a report and recommendation on August 13, 2003.[99] In determining the issue of whether Mr. Gardner's counsel was ineffective for failing to prepare and present adequate mitigation evidence, the magistrate judge reviewed Mr. Gardner's conviction to determine whether the Utah court had deprived Mr. Gardner of his fundamental constitutional rights.[100] State court findings of fact were given a presumption of correctness, while mixed questions of fact and law were reviewed de novo.[101] The magistrate judge considered each of the ineffective assistance

claim's elements—deficient performance and prejudice—separately. First, the magistrate judge held that Mr. Gardner's trial counsel's performance was deficient:

> [H]aving carefully reviewed the record, this court cannot say that counsels' decision not to more thoroughly investigate and present evidence of [Mr. Gardner's] disturbing background and possible organic brain damage can be justified as strategic; instead *counsels' failure to carefully investigate and present such evidence was the result of lack of investigation and preparation.* Trial counsel's investigation of [Mr. Gardner's] background and possible brain damage was haphazard at best.[102]

¶ 25 But the magistrate judge was not convinced that Mr. Gardner was prejudiced by his trial counsel's deficient performance. The magistrate judge noted that prejudice required showing a reasonable probability that, had Dr. Heinbecker been given adequate time to prepare, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[103] Specifically, the magistrate judge considered "the strength of the State's case, the aggravating circumstances the jury found, the mitigating evidence defense counsel *did* present, and the additional mitigating evidence the defense might have presented."[104] The magistrate judge first noted that the State's case for guilt was very strong—it was never disputed that Mr. Gardner shot and killed Mr. Burdell, rather the defense tried to argue that the shooting was not intentional.[105] But the State presented eyewitness testimony that Mr. Gardner aimed at Mr. Burdell, paused for a second or more, and then fired the gun.[106] Additionally, there was strong evidence that during his

94. *Id.* at 84.

95. *Id.*

96. *Id.*

97. *Id.*

98. *Id.*

99. *Id.* at 7, 237.

100. *Id.* at 34.

101. *Id.*

102. *Id.* at 92 (emphasis added).

103. *Id.* at 95 (internal quotation marks omitted).

104. *Id.* (emphasis added) (internal quotations and numbering omitted).

105. *Id.*

106. *Id.* at 95–96.

escape, Mr. Gardner was willing to and did kidnap and shoot other people.[107] Finally, the State presented the testimony of an officer who claimed Mr. Gardner admitted to him that he intended to kill Mr. Burdell and would have killed anyone else who tried to stop him from escaping.[108] The magistrate judge concluded that the State had a strong case that Mr. Gardner intended to kill Mr. Burdell.[109]

¶ 26 The magistrate judge then considered the strength of the aggravating evidence the jury had seen at trial. The magistrate judge considered the testimony of each of the twelve witnesses who testified about Mr. Gardner's criminal behavior since becoming incarcerated.[110] The magistrate judge concluded that "the State presented strong evidence during the sentencing phase that [Mr. Gardner] posed a continuing threat even while incarcerated and that previous attempts to deter [Mr. Gardner's] criminal behavior had failed." [111]

¶ 27 The magistrate judge then analyzed the evidence that Mr. Gardner's trial counsel presented in mitigation. Here the magistrate judge recalled the testimony of the witnesses who detailed the difficulty of Mr. Gardner's childhood, Mr. Fuchs's testimony regarding the amount of time convicted first degree murderers actually serve, and Dr. Heinbecker's testimony regarding evidence that Mr. Gardner had suffered organic brain damage.[112]

¶ 28 Finally, the magistrate judge considered what evidence might have been presented had Dr. Heinbecker been given adequate time to prepare. The magistrate judge considered here the testimony of Drs. Gummow, Logan, and Haney.[113] He concluded that given adequate time to prepare, a defense expert might have been able to present evidence of Mr. Gardner's troubled life, including evidence

of the difficult family and economic circumstances into which [Mr. Gardner] was born, of the neglect and abuse he endured from a young age, of the difficulties he experienced in school, of the various state placements he was sent to during most of his childhood, and of the startling lack of supervision and appropriate discipline he received from his parents, which resulted in such behaviors as drug use from a very young age.[114]

¶ 29 The magistrate judge credited this information as focusing "on lowering [Mr. Gardner's] culpability by presenting evidence that factors beyond [his] control, such as brain damage, genetics, and a childhood involving neglect and physical, emotional, and sexual abuse, greatly contributed to [Mr. Gardner's] behavior." [115]

¶ 30 Using these considerations to guide his decision, the magistrate judge concluded that the State had a very strong case that Mr. Gardner was "a continuing danger to others and ... a prisoner who [was] eager to escape and willing to commit more violent crimes." [116] The magistrate judge then concluded that some of the testimony Mr. Gardner's experts presented at the evidentiary hearing would not have helped—and indeed would have hurt—Mr. Gardner's case for mitigation. Specifically, Dr. Gummow testified that Mr. Gardner was dangerous, that it was difficult to assess whether Mr. Gardner could not control his impulses or whether he chose not to, that Mr. Gardner created his own stressful situation when he tried to escape, and that Mr. Gardner admitted that "all he thought about [while he was trying to escape] was getting out and getting back to doing cocaine." [117] Dr. Logan admitted that,

107. *Id.* at 96.

108. *Id.*

109. *Id.*

110. *See id.* at 97–101.

111. *Id.* at 97.

112. *Id.* at 101–03.

113. *Id.* at 104.

114. *Id.*

115. *Id.*

116. *Id.* at 105.

117. *Id.* at 106 (alteration in original) (internal quotation marks omitted).

even if Mr. Gardner had brain damage, he still bore some responsibility for his crimes, that not all of his criminal activities were a result of brain damage, that Mr. Gardner created his own stressful situation when he tried to escape, that Mr. Gardner was still a danger to society, that Mr. Gardner *can* sometimes control his behavior and not hurt others, and even that some of the evidence he presented could "cut both ways," meaning it was also aggravating evidence of future dangerousness.[118] Dr. Haney also admitted that Mr. Gardner's disadvantaged background might cut both ways and that apart from the facts of the crime itself, a defendant's future dangerousness and the need to stop the defendant from killing again "tends to be the most discussed topic[ ]" during jury deliberation.[119] These "double-edged sword" admissions by the defense experts were consistent with the testimony of the State's rebuttal witnesses.[120]

¶ 31 The magistrate judge also considered that the jury would have heard negative aspects of Mr. Gardner's background that had not originally been presented if the experts who testified at the federal habeas corpus hearings had testified at trial.[121] While the magistrate judge considered the defense expert testimony, on its own, a "double-edged sword," the magistrate judge also reasoned that the State would have further weakened its mitigating value by putting on rebuttal witnesses like Drs. Gardner and Golding, who opined that Mr. Gardner had antisocial personality disorder and not brain damage.[122] After a review of relevant case law, the magistrate judge ultimately concluded that

> [i]n light of the State's strong case, including its aggravating evidence, *no reasonable probability exists that*, had trial counsel

presented the additional mitigating evidence presented in this proceeding, and had trial counsel provided Dr. Heinbecker sufficient time to prepare to testify, *the jury would have imposed a sentence less than death*. The court therefore concludes that no prejudice under *Strickland* resulted from counsels' failure to present this mitigating evidence and therefore rejects [Mr. Gardner's] claim.[123]

¶ 32 After considering the other issues before the federal court, the magistrate judge recommended that Mr. Gardner's Petition for a Writ of Habeas Corpus be denied.[124]

## VII. MR. GARDNER'S NEW AND ADDITIONAL FEDERAL INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS ULTIMATELY DENIED AFTER HE FILES A SECOND STATE PETITION FOR POST–CONVICTION RELIEF IN STATE COURT

¶ 33 In 1999, two years after Mr. Gardner filed his first federal habeas corpus petition, he raised in that action a new claim challenging the effectiveness of his appellate counsel for failing to appeal the trial court's instruction to the jury regarding the word "knowingly." [125] This claim was added to Mr. Gardner's First Amended Petition on April 21, 2000.[126] The federal district court refused to determine whether or not this claim was procedurally barred under Utah law, and instead directed Mr. Gardner to file a second state petition for post-conviction relief to exhaust the claim.[127] The federal district court held this unexhausted claim in abeyance pending the state court resolution.[128]

---

118. *Id.* at 106–07 (internal quotation marks omitted).

119. *Id.* at 107 (internal quotation marks omitted).

120. *Id.* at 107–08.

121. *Id.* at 111.

122. *Id.* at 82–83, 111.

123. *Id.* at 116 (emphasis added).

124. *Id.* at 236.

125. *Gardner v. Galetka*, No. 2:95–CV–846–TC, 2007 WL 1071398, at *3, 2007 U.S. Dist. LEXIS 25651, at *9–10 (D.Utah Apr. 5, 2007).

126. *Id.* at *1 n. 1, 2007 U.S. Dist. LEXIS 25651, at *1 n. 1.

127. *Id.* at *3, 2007 U.S. Dist. LEXIS 25651, at *10; *Gardner v. Galetka*, 2004 UT 42, ¶ 5, 94 P.3d 263.

128. *Id.*

¶ 34 Mr. Gardner filed his second state petition for post-conviction relief on May 12, 2000.[129] The State moved for summary judgment and the Utah district court granted the State's motion after reaching the merits of Mr. Gardner's claim.[130] We affirmed the district court's grant of summary judgment, but not on the merits.[131] Instead, we affirmed on the alternative ground that it was improper to reach the merits of Mr. Gardner's claim because it was procedurally barred by the 1996 Post–Conviction Remedies Act ("PCRA") since he could have brought the claim in his first state petition for post-conviction relief.[132] We also noted that, while we had the power to set aside the procedural bars of the PCRA, any "good cause" exception to the procedural bar did not apply because Mr. Gardner's claim was not "facially plausible." [133]

¶ 35 Upon returning to federal court, Mr. Gardner was informed that our decision did not address the issues the federal court needed it to address. According to the federal district court, federal habeas corpus law required a determination of the question of procedural default based on the law in effect at the time the first state petition for post-conviction relief was filed.[134] The relevant date, it concluded, was 1990.[135] Because we resolved Mr. Gardner's claims according to the law in effect when he filed his second petition for post-conviction relief in state court, the federal district court certified to us the following question: "If Mr. Gardner had raised the ineffective assistance of counsel claim at issue in [Mr. Gardner's second state petition for post-conviction relief], in state court in a successive petition in 1990, would the petition have been procedurally barred?" [136] We responded by holding

> that, in 1990, Gardner's successive post-conviction claim regarding the ineffective assistance of counsel would have been procedurally barred because it could have been brought in a prior post-conviction proceeding. The "good cause" common law exceptions to the procedural bar that we established in *Hurst v. Cook* were unavailable to Gardner because his successive post-conviction claim is *"facially implausible"* and therefore would have been summarily dismissed without substantive review on its merits. As a result, Gardner's successive post-conviction petition would have been procedurally barred as a matter of 1990 state law.[137]

¶ 36 Despite our holding that the claim would have been procedurally barred on state law grounds, because we based part of that holding on a "threshold finding" that Mr. Gardner's claim was of a "frivolous" nature that would prevent any exception to the procedural bar from applying, the federal district court proceeded with the claim as though we had reached the merits of a federal issue, and thus the federal district court decided to reach the merits.[138] The Tenth Circuit would later find that the federal district court had not needed to reach the merits of the claim because the PCRA bar was an independent state law ground for rejecting Mr. Gardner's claim.[139] The Tenth Circuit concluded that merely because exceptions to that procedural rule might exist, the

---

129. *Id.* ¶ 13.

130. *Id.* ¶ 8.

131. *Id.*

132. *Id.* ¶¶ 8, 13, 19.

133. *Id.* ¶ 16 (describing Mr. Gardner's claim as "absurd").

134. *Gardner v. Galetka,* 2007 WL 1071398, at *3–4, 2007 U.S. Dist. LEXIS 25651, at *11.

135. *Id.*

136. *Id.*

137. *Gardner v. Galetka,* 2007 UT 3, ¶ 2, 151 P.3d 968 (emphasis added) (citation omitted).

138. *Gardner v. Galetka,* 2007 WL 1071398, at *6, 2007 U.S. Dist. LEXIS 25651, at *17–18.

139. *Gardner v. Galetka,* 568 F.3d 862, 884 (10th Cir.2009) (citing *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). In *Michigan v. Long,* the United States Supreme Court noted that "jurisdictional concerns" preclude federal court review of state court judgments that rest on "adequate and independent state grounds." 463 U.S. at 1042, 103 S.Ct. 3469.

rule was no "less procedural" as a result.[140] Nevertheless, on the merits, the federal district court concluded that Mr. Gardner had not affirmatively proved prejudice on his ineffective assistance of counsel claim on the "knowingly" instruction, and on April 5, 2007, denied his petition as to this claim.[141] The Tenth Circuit would eventually agree that, even though the district court did not need to reach the merits, the district court was correct in concluding that the "knowingly" claim failed on its merits.[142]

## VIII. THE FEDERAL DISTRICT COURT ADOPTS THE MAGISTRATE JUDGE'S RECOMMENDATION AND DISMISSES THE REMAINDER OF MR. GARDNER'S HABEAS CORPUS PETITION

¶ 37 The same day the federal district court decided Mr. Gardner's "knowingly" claim, it decided his other claims in a separate order. Making only minor changes to the magistrate judge's findings, the federal district court adopted those findings and also adopted the magistrate judge's recommendation that Mr. Gardner's Petition for Writ of Habeas Corpus be denied.[143] On the issue of whether trial counsel was ineffective in failing to produce mitigation evidence, the court agreed with the magistrate judge's findings, but added clarification.[144] Mr. Gardner argued "that the Magistrate Judge failed to consider that under Utah law, the State must prove beyond a reasonable doubt that the

aggravating circumstances outweigh the mitigating circumstances" and that he ignored Utah's requirement that a jury imposing a death sentence be unanimous.[145] After reviewing the report, the district court found that the magistrate judge did take Utah law into consideration.[146] The district court also added that *it* considered Utah law when conducting *its own de novo review* of the report, and it concluded that "[e]ven in light of the State's burden of establishing that the aggravating circumstances outweigh the mitigating circumstances and the requirement of unanimity, the court finds that Mr. Gardner has failed to show the necessary prejudice." [147] When addressing an earlier ineffective assistance of counsel claim, the federal district court noted that it did not need to address that claim's deficient-performance prong if it first concluded there was no prejudice.[148] Finding no prejudice here, it also did not address the deficient-performance prong of this ineffective assistance of counsel claim.[149] On April 5, 2007, the federal district court entered two final orders dismissing this and all other claims raised in Mr. Gardner's First Amended Petition for Habeas Corpus.[150]

## IX. THE TENTH CIRCUIT AFFIRMS THE DECISION OF THE FEDERAL DISTRICT COURT

¶ 38 Mr. Gardner timely appealed the federal district court's final orders that, together, rejected all his claims.[151] Pursuant to the

---

**140.** *Gardner v. Galetka*, 568 F.3d at 884.

**141.** *Gardner v. Galetka*, 2007 WL 1071398, at *9–10, 2007 U.S. Dist. LEXIS 25651, at *29–31.

**142.** *Gardner v. Galetka*, 568 F.3d at 884.

**143.** *Gardner v. Galetka*, No. 2:95–CV–846–TC, 2007 WL 1071400, at *1, 7, 2007 U.S. Dist. LEXIS 25643, at *2, 21–22 (D.Utah Apr. 5, 2007).

**144.** *Id.* at *3–4, 2007 U.S. Dist. LEXIS 25643, at *10–11.

**145.** *Id.* at *3, 2007 U.S. Dist. LEXIS 25643, at *10.

**146.** *Id.* at *3–4, 2007 U.S. Dist. LEXIS 25643, at *10–11.

**147.** *Id.* at *4, 2007 U.S. Dist. LEXIS 25643, at *11.

**148.** *Id.* at *1, 2007 U.S. Dist. LEXIS 25643, at *4–5.

**149.** *See id.* at *3, 2007 U.S. Dist. LEXIS 25643, at *9. The Tenth Circuit also noted that "[u]nlike the magistrate judge, the district court did not address the deficiency issue, concluding that there was no prejudice." *Gardner v. Galetka,* 568 F.3d 862, 877 (10th Cir.2009).

**150.** *See Gardner v. Galetka,* No. 2:95–CV–846–TC, 2007 WL 1071398, at *10, 2007 U.S. Dist. LEXIS 25651, at *30–31 (D.Utah Apr. 5, 2007); *Gardner v. Galetka,* 2007 WL 1071400, at *7, 2007 U.S. Dist. LEXIS 25643, at *21–22.

**151.** *Gardner v. Galetka,* 568 F.3d 862, 870 (10th Cir.2009).

Anti–terrorism and Effective Death Penalty Act ("AEDPA"), the Tenth Circuit applied a standard of review deferential to Utah courts.[152] Under this standard of review, Mr. Gardner could only prevail if

> the state adjudication on the merits "(1) resulted in a decision that was contrary to, or involved an *unreasonable application of, clearly established Federal law* as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." [153]

¶ 39 Despite the federal district court's application of a de novo standard of review as to the issue of trial counsel's ineffectiveness, and contrary to the arguments made by both the State and Mr. Gardner, the Tenth Circuit applied the more deferential AEDPA standard to that claim as well.[154]

¶ 40 The Tenth Circuit concluded that our decision "that Mr. Gardner was not prejudiced by his counsel's failure to provide Dr. Heinbecker with more time to prepare was not unreasonable." [155] But even though the Tenth Circuit gave our decision deference, it conducted a fact-intensive analysis that strongly indicated its view that Mr. Gardner was not prejudiced by his expert's lack of preparation time.[156] For instance, the court concluded that even though Dr. Heinbecker only had a day to prepare, he was able to testify that

> Mr. Gardner had an *unstable upbringing,* the product of *a broken home.* His mother had difficulty disciplining her nine kids, *his step-father was incarcerated,* his *family had lengthy criminal and substance abuse*

*histories,* and his mother was charged with *parental neglect* when Mr. Gardner was two and five. Dr. Heinbecker further testified that Mr. Gardner was *in and out of state institutions* for most of his life, and tests revealed *some evidence of organic brain damage.*[157]

¶ 41 The Tenth Circuit then reasoned that any additional evidence Dr. Heinbecker might have presented had he been given more time to prepare would only have "added color" to what he *did* testify to during the penalty phase.[158] The court stated that "[k]nowing of [Mr. Gardner's] difficult upbringing and possible brain damage did not convince a jury to forego the death penalty." [159] It opined that additional details about Mr. Gardner's "youthful drug use, criminal history, and scores on various mental tests" would likely not have changed the jury's mind, especially because, given that the evidence also tended to show Mr. Gardner's future dangerousness, the evidence could have had a double-edged effect.[160] Further, if Dr. Heinbecker had introduced evidence that Mr. Gardner was not fully in control of his actions, the Tenth Circuit reasoned that the State would have introduced rebuttal evidence to prove volition, including previously unintroduced evidence of past violent acts that appeared to be calculated and controlled;[161] expert testimony that Mr. Gardner's antisocial personality disorder did not impair his volition; evidence from Mr. Gardner's own experts that showed that Mr. Gardner "performs well under stress and always manages to stop when his life is threatened"; Mr. Gardner's own statement that his motivation for trying to escape was so that he could return to drug use; and evidence that Mr. Gardner's antisocial per-

---

152. *Id.*

153. *Id.* (emphasis added) (quoting 28 U.S.C. § 2254(d)(1) and (2)).

154. *Id.* at 877–79. Both parties apparently believed that federal case law required the Tenth Circuit to conduct de novo review of this claim. *See id.*

155. *Id.* at 883.

156. *See id.* at 880–83.

157. *Id.* at 880–81 (emphasis added).

158. *Id.* at 881.

159. *Id.*

160. *Id.*

161. The Tenth Circuit may be referring here to sealed testimony received by the magistrate judge during the federal evidentiary hearings that is particularly damaging to Mr. Gardner's mitigation case.

sonality disorder was brought on by his own extensive drug use.[162]

¶ 42 Ultimately, the court concluded that any difference between the testimony Dr. Heinbecker gave and the testimony he might have given with more preparation time was merely a difference of degree, and that Dr. Heinbecker would not have found evidence that supported a different diagnosis.[163] The evidence the defense found after a full investigation, the court reasoned, only supported "moderate brain damage," largely brought on by Mr. Gardner's own drug use—"and Dr. Heinbecker testified with regard to these impairments."[164] The Tenth Circuit concluded that despite Dr. Heinbecker's time constraints, he effectively conveyed "mitigating evidence regarding Mr. Gardner's family history, possible organic brain damage, and social circumstances."[165]

¶ 43 Supported by this reasoning, the Tenth Circuit held that our decision on this issue was not unreasonable and, after reviewing each of the other issues before it, affirmed the federal district court's dismissal of Mr. Gardner's Petition for Writ of Habeas Corpus.[166] On March 8, 2010, the United States Supreme Court denied Mr. Gardner's petition for writ of certiorari from the Tenth Circuit's decision.[167]

## X. THE UTAH DISTRICT COURT ISSUES A WARRANT OF EXECUTION AND WE UPHOLD IT

¶ 44 On March 10, 2010, the State filed an Application for Execution Warrant pursuant to section 77–19–9(1) of the Utah Code. Mr. Gardner filed a Memorandum of Facts and Legal Reasons Against Issuance of the Judgment, arguing that subsection (2) of that same statute required the district court to hold a hearing to determine if there were any facts or legal reasons why a warrant of execution should not issue. Mr. Gardner pre-

sented three claims that he argued constituted "legal reasons" against execution of the judgment: first, that his rights to equal protection, uniform operation of the laws, and due process were violated because he did not have paid counsel and state funding for investigators and expert witnesses while pursuing his post-conviction review; second, that executing his death sentence twenty-five years after his conviction constituted cruel and unusual punishment; and third, that the district court should consider the desires of Mr. Burdell's friends and family in determining whether to issue the warrant. The district court concluded that none of Mr. Gardner's issues constituted a "legal reason" against executing the judgment of death as contemplated by section 77–19–9. The district court concluded that it was limited to reviewing the case history to determine if all direct and collateral attacks on the judgment had been resolved, so it did not reach the merits of Mr. Gardner's claims. On April 23, 2010, the district court signed and issued an order for Mr. Gardner's execution, setting Mr. Gardner's execution date for June 18, 2010.

¶ 45 Mr. Gardner appealed the issuance of the death warrant to this court. The State argued, and we agreed, that issuance of the death warrant is "neither a judgment of conviction nor an order that affects the rights of the defendant," so the issuance of Mr. Gardner's death warrant was not an appealable order.[168] Instead, and as the State conceded was proper, we considered Mr. Gardner's appeal as a petition for extraordinary writ and reviewed whether it was an abuse of the district court's discretion to deny Mr. Gardner's application for relief under section 77–19–9.[169] We held that the district court did not abuse its discretion because the statute only required the district court to review "the procedural status of the case and to determine that no direct or collateral attacks

---

162. *Id.*

163. *Id.* at 882.

164. *Id.* at 883.

165. *Id.*

166. *Id.* at 883, 894.

167. *Gardner v. Galetka,* —— U.S. ——, 130 S.Ct. 1737, 176 L.Ed.2d 215 (2010).

168. *See State v. Gardner,* 2010 UT 44, ¶ 2, 234 P.3d 1104 (per curiam).

169. *Id.*

on the judgment are pending, that no stays are in effect, and that there are no procedural defects in the warrant application process." [170] We also held that section 77–19–9 does "not permit review of substantive claims that the underlying sentence is invalid." [171] Concluding that the district court's interpretation of the statute was correct and that it did not abuse its discretion, we denied Mr. Gardner's request for extraordinary relief. [172]

## XI. MR. GARDNER FILES A THIRD PETITION FOR POST–CONVICTION RELIEF, WHICH THE DISTRICT COURT DISMISSES

¶ 46 The petition we consider here was filed on May 4, 2010. This is Mr. Gardner's third state petition for post-conviction relief. The day after he filed this petition, he filed a Motion to Stay Execution. In his petition, Mr. Gardner raised two central claims: first, he argued that executing the judgment of death against him would violate his rights to equal protection and due process under the Utah and United States Constitutions because no court had fully and fairly considered all of the mitigating evidence developed in his case in order to determine whether he received ineffective assistance of counsel at the penalty phase of his trial; second, he argued that executing the judgment of death against him would constitute cruel and unusual punishment because, given that the crime for which he is being punished occurred twenty-five years ago, no deterrent or retributive purpose would be served by his execution.

¶ 47 Regarding his first claim, Mr. Gardner argued that every other currently living death row inmate was entitled to receive state funding for counsel and investigative resources in state post-conviction proceedings, and that since he was not, he was being treated differently than other similarly situated persons, which he argued violated his rights to equal protection under the state and federal constitutions. He argued that this deprivation of funding meant that he was not

able to develop the prejudice prong of his penalty-phase ineffective assistance of counsel claim with expert testimony until his federal habeas corpus proceedings, and that as a result, no Utah court had ever been presented with the full range of mitigating evidence he was able to develop. And since the Tenth Circuit did not review this evidence de novo, but rather applied a deferential standard of review, Mr. Gardner argued that his due process rights were violated "because no court has given his mitigation evidence a full and fair consideration."

¶ 48 Regarding his second claim, Mr. Gardner argued that because he committed the crime in 1985, executing him twenty-five years later no longer has deterrent value. Mr. Gardner also argued that because Mr. Burdell's family and friends do not want him to be executed, and because no jury had ever heard the full range of his mitigating evidence, the death penalty would also serve no retributive purpose. Mr. Gardner concluded that since the two primary purposes of punishment are deterrence and retribution, his execution would serve neither valid purpose, and would therefore be cruel and unusual punishment.

¶ 49 On May 14, 2010, the State moved for summary judgment on Mr. Gardner's claims for post-conviction relief. The State argued that Mr. Gardner's claims were untimely and procedurally barred under the PCRA, and that they were also meritless. Mr. Gardner responded that his claims were not procedurally barred under the PCRA because he had not and could not have brought them in an earlier petition for post-conviction relief. He argued his due process and equal protection claims were not untimely because the last fact giving rise to his claim that no court would give his ineffective assistance of counsel claim a full and fair consideration was the Tenth Circuit's refusal to apply a de novo standard of review in his federal habeas corpus case, [173] and he filed this petition within

---

**170.** *Id.* ¶ 3.

**171.** *Id.*

**172.** *Id.* ¶ 4.

**173.** Mr. Gardner argued that the date upon which the Tenth Circuit's decision became final was March 8, 2010, the day on which the United States Supreme Court denied his petition for certiorari.

one year of learning of that fact, the time mandated by the PCRA. Mr. Gardner argued that his cruel and unusual punishment claim was not time barred because the passage of time is the basis of his claim and constitutes newly discovered evidence under the PCRA; that the relevant date for the purposes of this claim was the signing of his warrant of execution; and that he did not know his execution would serve no retributive purpose until the Tenth Circuit refused to review his mitigation evidence de novo.

¶ 50 But Mr. Gardner also argued that even if his claims were untimely or procedurally barred, the district court should still reach their merits. The Utah Constitution, Mr. Gardner argued, provides two exceptions to any time or procedural bar of the PCRA. First, Mr. Gardner argued an "interests of justice" exception exists for untimely claims. Second, he argued that Utah common law and the Utah Constitution allow for otherwise precluded claims to be examined for "good cause shown." He argued that he had shown good cause for not bringing his claims in a prior petition and that both constitutional exceptions apply to any statute that might bar his current petition.

¶ 51 The district court agreed with the State, granted its motion for summary judgment, and dismissed Mr. Gardner's third petition for post-conviction relief. The district court found that Mr. Gardner's due process and equal protection claims were untimely because the conclusion of federal court review was not the relevant date for the PCRA statute of limitations, but rather the relevant date was the day on which Mr. Gardner became aware he had newly developed mitigation evidence, which was presented to the federal magistrate judge in September 1999. The district court concluded that the PCRA required Mr. Gardner to have brought this claim by September 2000, one year after having discovered the evidence. The district court also held that this claim was procedurally barred because the PCRA bars any claim that "could have been, but was not, raised in a previous request for post-convic-

tion relief."[174] Since Mr. Gardner filed a second petition for post-conviction relief on May 12, 2000, and that petition did not include his due process and equal protection claims, the district court held those claims were now barred.

¶ 52 The district court held Mr. Gardner's cruel and unusual punishment claim was also both untimely and procedurally barred. The district court held the claim was untimely because Mr. Gardner learned of the mitigation facts that arguably made his sentence serve no retributive value in 1999 and that, by that point, he had been on death row for fourteen years, which meant he was aware of the evidentiary facts—i.e., the passage of time—relevant to his deterrence claim. The district court held the cruel and unusual punishment claim was procedurally barred because, like Mr. Gardner's other claim, it could have been brought in his second state petition for post-conviction relief in 2000.

¶ 53 Finally, the district court held that the "good cause" and "interests of justice" exceptions to the PCRA's time or procedural bars were no longer available as a result of recent amendments to the PCRA. The district court held that the intent of these amendments was to "restrict any exceptions to the procedural bar rule to those found in the PCRA" so that the PCRA was now the "sole remedy" for any person who wanted to collaterally challenge a conviction or sentence. For this reason, the district court declined to consider the merits of Mr. Gardner's claims under a "good cause" or "interest of justice" exception.

¶ 54 Following the district court's grant of summary judgment in favor of the State, Mr. Gardner filed a timely notice of appeal. We now consider the correctness of the district court's grant of summary judgment.

## STANDARD OF REVIEW

■ ¶ 55 " 'We review an appeal from an order dismissing or denying a petition for post-conviction relief for correctness without deference to the lower court's conclusions of law.' "[175]

---

174. Utah Code Ann. § 78B–9–106(1)(d) (2008).

175. *Taylor v. State*, 2007 UT 12, ¶ 13, 156 P.3d 739 (quoting *Gardner v. Galetka*, 2004 UT 42, ¶ 7, 94 P.3d 263).

## ANALYSIS

¶ 56 In this appeal, we must determine whether the district court erred in granting summary judgment in favor of the State with regard to Mr. Gardner's most recent petition for post-conviction relief. Mr. Gardner argues that the district court incorrectly granted the State's motion for two principal reasons. First, Mr. Gardner argues that the district court erred in determining when his substantive claims arose and that the court consequently erred in granting the State's motion for summary judgment on the basis that Mr. Gardner's claims are precluded by the PCRA.[176] Second, Mr. Gardner argues that the district court erred in concluding that it lacked authority to set aside the PCRA's procedural bars in the interests of justice. As a result, he claims, the court erred in granting the State's motion without invoking an "interests of justice" exception to reach the merits of his claims.[177]

¶ 57 We affirm the district court's grant of summary judgment in favor of the State, and find that we need not reach Mr. Gardner's arguments regarding the scope of judicial authority to set aside the procedural bar of the PCRA. Specifically, we hold that: (I) the district court did not err in concluding that review of Mr. Gardner's claims is precluded by the procedural and limitations bars of the PCRA; and (II) the district court did not err in declining to apply an exception to the procedural and limitations bars of the PCRA because any exception that might support setting aside those provisions is not available to Mr. Gardner in this case. Accordingly, we affirm the district court's grant of summary judgment in favor of the State.

### I. THE DISTRICT COURT CORRECTLY CONCLUDED THAT MR. GARDNER'S SUBSTANTIVE CLAIMS ARE BARRED BECAUSE THEY COULD HAVE BEEN RAISED IN A PRIOR POST–CONVICTION PROCEEDING AND BECAUSE THEY ARE UNTIMELY

¶ 58 The district court correctly concluded that Mr. Gardner's due process, equal protection, and cruel and unusual punishment claims are all barred by the PCRA. Broadly speaking, if a defendant's sentence or conviction is affirmed after direct appeal, or if no direct appeal is taken, the convicted person may pursue a post-conviction remedy by filing a petition under the PCRA.[178] The PCRA "establishes the sole remedy for any person who challenges a conviction or sentence for a criminal offense and who has exhausted all other legal remedies." [179] In addition to establishing the legal avenue for a convicted person to pursue post-conviction relief, the PCRA establishes a number of procedural requirements.[180] A petition for relief that does not meet these procedural requirements is barred.[181]

¶ 59 Two of these procedural requirements form the basis for our decision. The first, which we will refer to as the "procedural bar," precludes relief in those cases where the petitioner asserts grounds for relief that could have been asserted in a prior or contemporaneous proceeding.[182] Specifically, the petitioner may not seek relief based on

---

**176.** See Utah Code Ann. §§ 78B–9–101 to –110 (2008).

**177.** Mr. Gardner also argued that the district court erred in denying his Motion to Stay Execution, which was filed pursuant to Utah Code section 77–19–8. We need not address this issue. Although Mr. Gardner argued below that such a stay was mandatory, before us he seeks only "a temporary stay ... pending resolution of this post-conviction matter." In his brief on appeal and at oral argument, counsel for Mr. Gardner asserted that such a stay could be granted in the discretion of this court if staying the execution would be necessary "to consider fully this matter." We have given this case the care and consideration necessitated by the profound importance of the decision with which we are faced and the significance of the issues involved and we are satisfied that we need not stay Mr. Gardner's execution in order to resolve the issues presented. We therefore do not examine the correctness of the district court's basis for denying the stay.

**178.** See Utah Code Ann. § 78B–9–102(1) (2008).

**179.** Id.

**180.** See id. §§ 78B–9–106 to –107.

**181.** See id.

**182.** Id. § 78B–9–106(1).

grounds that "may still be raised on direct appeal or by a post-trial motion," [183] or on grounds that were already raised at trial or on direct appeal or "could have been but [were] not raised at trial or on appeal." [184] Relief is also precluded if the grounds for relief asserted by the petitioner were raised and addressed in a prior post-conviction proceeding or if the grounds "could have been, but [were] not, raised" in a prior post-conviction proceeding.[185]

¶ 60 The second procedural requirement, which we will refer to as the "limitations bar," establishes the time period within which new claims for relief must be raised. That is, even if a claim is not precluded by the procedural bar, a petitioner's claim for relief is barred if the petition is not timely filed.[186] Under the PCRA, a petition for post-conviction relief must be "filed within one year after the cause of action has accrued." [187]

¶ 61 By statute, the accrual date for the limitations bar is the latest date on which one of a number of specific milestones occur.[188] Where the conviction is not challenged on appeal, the accrual date is the last day on which the direct appeal could have been filed.[189] Where the conviction is challenged on direct appeal, the accrual date is the date that the appellate court decision is entered.[190] Where certiorari review may be sought from either this court or the United States Supreme Court, the accrual date occurs either on the last date for filing a petition for certiorari, if such a petition is not filed, or, if one is filed, on the date that petition is denied or otherwise decided.[191] Finally, if evidentiary facts arise at a date later than all of the dates already described, the petitioner may file a petition within one year of the date

that the petitioner "knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." [192] We will affirm a district court's grant of summary judgment in favor of the State on a petition for post-conviction relief when the petitioner's claim fails to meet the requirements of this provision.[193]

¶ 62 If the petitioner's claim is found to be procedurally proper, relief may be granted on one of the specific grounds set forth in the PCRA. The grounds relevant to this appeal are set forth at subsection 78B–9–104(1)(a) of the Utah Code. This provision permits a criminal sentence to be modified or vacated if "the conviction was obtained or the sentence was imposed in violation of the United States Constitution or Utah Constitution." [194] Under the PCRA, the burden of proof in this proceeding rests on the petitioner.[195] And "[t]he court may not grant relief from a conviction or sentence unless the petitioner establishes that there would be a reasonable likelihood of a more favorable outcome in light of the facts proved in the post-conviction proceeding, viewed with the evidence and facts introduced at trial or during sentencing." [196]

¶ 63 In this post-conviction proceeding, Mr. Gardner argues that a large amount of mitigating evidence was developed during the course of his federal habeas corpus action and that, because that evidence has received only limited review, permitting his sentence to be carried out would violate the due process and equal protection guarantees found in both the United States and Utah Constitutions. He also argues that the state and federal constitutional prohibitions against cruel and unusual punishment have been violated by virtue of the fact that more than

183. *Id.* § 78B–9–106(1)(a).

184. *Id.* § 78B–9–106(1)(b) to –106(1)(c).

185. *Id.* § 78B–9–106(1)(d).

186. *Id.* § 78B–9–106(1)(e), –107(1).

187. *Id.* § 78B–9–107(1).

188. *Id.* § 78B–9–107(2).

189. *Id.* § 78B–9–107(2)(a).

190. *Id.* § 78B–9–107(2)(b).

191. *Id.* § 78B–9–107(2)(c) to –107(2)(d).

192. *Id.* § 78B–9–107(2)(e).

193. *See Kell v. State,* 2008 UT 62, ¶¶ 17, 19–20, 194 P.3d 913.

194. Utah Code Ann. § 78B–9–104(1)(a).

195. *Id.* § 78B–9–105(1).

196. *Id.* § 78B–9–104(2).

twenty-five years have elapsed since his sentence of death was imposed.

¶ 64 We conclude that Mr. Gardner's claims are precluded by both the procedural bar and the limitations bar contained in the PCRA. Specifically, we conclude that all of Mr. Gardner's claims are barred either because they could have been raised when he sought post-conviction relief in state court in 2000 or because he has been aware of the facts underlying his claims for more than one year. Because the relevant dates for both the procedural bar and the limitations bar vary among the claims, we will address them separately in our analysis. We address, in turn, Mr. Gardner's due process, equal protection, and cruel and unusual punishment claims.

A. *Mr. Gardner's Due Process Claims Are Barred Because They Could Have Been, but Were Not, Asserted in His Second State Petition for Post-conviction Relief or Within One Year of the Conclusion of His Federal Evidentiary Hearing in 1999*

 ¶ 65 The claims Mr. Gardner asserts under the Due Process Clauses of the United States and Utah Constitutions are barred because they could have been raised at any time after 1999, including in Mr. Gardner's second state petition for post-conviction relief. As stated, the procedural bar contained in the Preclusion of Relief provision of the PCRA deems a petitioner to be "not eligible for relief" based on a ground that "was raised or addressed at trial or on appeal" or "was raised or addressed in any previous request for post-conviction relief or could have been, but was not, raised in a previous request for post-conviction relief." [197] The limitations bar of the PCRA requires all claims for post-conviction relief to be raised within one year of the "date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." [198] We conclude that Mr. Gardner could have raised these claims in his second state petition for post-conviction relief, filed in state court in May 2000, or at any other time in the year after this evidence was adduced in 1999, and that he is therefore barred from raising it in this successive petition.

197. *Id.* § 78B–9–106(1).

198. *Id.* § 78B–9–107(1) to –107(2)(e). We find the other accrual dates of the limitations bar to be inapplicable in this case. As Mr. Gardner points out, the PCRA permits petitions to be filed within one year of "the entry of the denial of the petition for writ of certiorari." *See id.* § 78B–9–107(2)(d). And since the limitations period is measured by reference to "the latest" accrual date, *id.* § 78B–9–107(2), Mr. Gardner argues that his accrual date should be identified relative to the denial of his most recent Petition for Writ of Certiorari to the United States Supreme Court. Here, that date would be March 8, 2010, because that is when the United States Supreme Court declined to review the Tenth Circuit decision in Mr. Gardner's federal action. *See Gardner v. Galetka,* — U.S. ——, 130 S.Ct. 1737, 176 L.Ed.2d 215 (2010).

This is not the measuring date for determining timeliness. The accrual dates enumerated by the limitations bar are set forth in step-wise fashion. If no appeal is taken, the limitations period begins on the date the final judgment is entered. Utah Code Ann. § 78B–9–107(2)(a). If an appeal is taken, the limitations period begins on the date the appellate court enters its decisions. *Id.* § 78B–9–107(2)(b). If a petition for writ of certiorari is not filed, the limitations period begins on the last date that such a petition could be filed. *Id.* § 78B–9–107(2)(c). And if a petition for writ of certiorari is filed, the limitations period begins on the date that that petition is denied, or on the day that the decision with regard to that petition is entered. *Id.* § 78B–9–107(2)(d).

The sequential articulation of these statutory accrual dates makes it clear that they each refer to a point in the process of the petitioner's direct appeal. Only the petition for writ of certiorari review of the appellate court decision referenced in the previous subsection of the statute is relevant for purposes of this subsection.

Otherwise, the provisions regarding petitions for writ of certiorari become entirely divorced from their statutory context. *See Berneau v. Martino,* 2009 UT 87, ¶ 12, 223 P.3d 1128 ("'[E]ach part [of a statute] should be construed in connection with every other part ... so as to produce a harmonious whole.'") (internal quotation marks omitted). Moreover, if the subsections related to petitions for writ of certiorari were interpreted to mean *any* such petition, the entire limitations bar would become meaningless, because petitioners could repeatedly invoke state court proceedings to pursue meritless claims and then, once the claims are rejected, file petitions for writ of certiorari review. Accordingly, we conclude that the accrual date for purposes of this appeal is the date on which Mr. Gardner knew or should have known of the facts giving rise to his claim.

¶ 66 Mr. Gardner's claims have their origin in the fact that, in pursuing his first state petition for post-conviction relief, he was not provided with funds for an investigation into the deficiencies of his trial counsel during the mitigation phase of his sentencing.[199] But this, standing alone, does not form the basis of his claim.[200] Rather, he argues that, now that he has collected evidence as a result of a federally funded investigation into trial counsel's deficiencies, it is a violation of due process for this court not to consider that evidence.

¶ 67 Indeed, that evidence came into existence, in its current form, during an evidentiary hearing conducted by the federal magistrate judge.[201] That hearing took place over the course of approximately ten days in September and October 1999.[202] The evidence adduced at that hearing formed part of the basis of the magistrate judge's report and recommendation to the federal district court, which was issued in 2003.[203] The federal district court reviewed that evidence and adopted the magistrate judge's report and recommendation in an opinion issued in 2007.[204] The Tenth Circuit reviewed that decision and issued its opinion in June 2009.[205]

¶ 68 In April 2000, several months after the evidentiary hearing had brought forth the evidence on which he now relies, Mr. Gardner also amended his federal habeas corpus petition to add a claim regarding trial counsel's failure to object to a jury instruction.[206] The federal district court permitted this amendment, but held the claim in abeyance while Mr. Gardner, pursuant to standards of federal habeas corpus review, pursued his claim in state court in order to exhaust his state remedies.[207] That claim

---

199. *See Gardner v. Holden*, 888 P.2d 608, 622 (Utah 1994).

200. Mr. Gardner fully litigated this component of his claim during his first post-conviction proceeding before this court. *See id.* at 622–23. We held, as discussed above, that he had no right, either statutory or constitutional, to funding for these experts because he had failed to show that "he could not adequately pursue his habeas claims without appointed investigators and expert witnesses." *Id.*

Notably, Mr. Gardner did not raise this argument in his federal habeas corpus proceedings. *See Gardner v. Galetka*, No. 2:95–CV–846–TC, 2007 WL 1071400, 2007 U.S. Dist. LEXIS 25643 (D.Utah Apr. 5, 2007); *Gardner v. Galetka*, No. 2:95–CV–846–TC, 2007 WL 1071398, 2007 U.S. Dist. LEXIS 25651 (D.Utah Apr. 5, 2007). He did argue that he was denied effective assistance of counsel both at trial and on direct appeal. *See Gardner v. Galetka*, 2007 WL 1071400, at *1–4, 2007 U.S. Dist. LEXIS 25643, at *2–13. This argument was rejected by every federal court that reviewed it. Even after Mr. Gardner received federal funds and was permitted to adduce the evidence he desired, the magistrate judge and the federal district court both concluded that no prejudice resulted from Mr. Gardner's inability to present this evidence during his sentencing phase. *See id.* at *3–4, 2007 U.S. Dist. LEXIS 25643, at *10–11. And because the failure at trial was not prejudicial, they concluded, his counsel's failure to pursue this claim on direct appeal also could not have been prejudicial. *See id.* at *4, 2007 U.S. Dist. LEXIS 25643, at *12–13.

The Tenth Circuit declined to engage in the kind of de novo review undertaken by the Federal District Court. *Gardner v. Galetka*, 568 F.3d 862, 877–89 (10th Cir.2009). Viewing the claims instead under the standard of review required by the federal Antiterrorism and Effective Death Penalty Act, *see* 28 U.S.C. § 2254(d), the Tenth Circuit concluded that our initial review of Mr. Gardner's claims was not unreasonable. *See Gardner v. Galetka*, 568 F.3d at 883.

201. Magistrate Report, *supra* note 4, at 6–7, 73–84.

202. *Id.* at 6–7.

203. *Id.* at 74–84.

204. *See Gardner v. Galetka*, 2007 WL 1071400, 2007 U.S. Dist. LEXIS 25643.

205. *See Gardner v. Galetka*, 568 F.3d 862 (10th Cir.2009).

206. *See Gardner v. Galetka*, 2007 WL 1071398, at *1, 2007 U.S. Dist. LEXIS 25651, at *1–2.

207. *Id.* at *3, 2007 U.S. Dist. LEXIS 25651 at *10. Mr. Gardner also clearly could have raised his due process, equal protection, and cruel and unusual punishment claims in his federal habeas corpus action. In April 2000, several months after this evidence came to light during the evidentiary hearing, Mr. Gardner sought, and was granted, leave to amend his habeas corpus petition to include a challenge to trial counsel's failure to object to a jury instruction. *Compare* Magistrate Report, *supra* note 4, at 6–7 (showing that the evidentiary hearings occurred in September and October 1999) *with Gardner v. Galetka*, 2007 WL 1071398, at *1 n. 1, 2007 U.S. Dist. LEXIS 25651, at *1 n. 1 (showing Mr. Gardner

formed the basis of Mr. Gardner's second state petition for post-conviction relief, which he filed on May 12, 2000.[208] We reviewed that claim in 2004 and found that it was procedurally barred.[209] In spite of the fact that the evidence developed in his federal proceedings was known to him in 1999, Mr. Gardner did not present this due process claim in that proceeding. Indeed, he has not argued until now that due process guarantees require consideration of that evidence.

¶ 69 We note that this claim is virtually indistinguishable from the claim that Mr. Gardner presented in his first state petition for post-conviction relief. In that action, he argued before this court that the failure to fund his post-conviction investigation was a denial of due process.[210] Implicit in this argument is the notion that the Due Process Clause also requires a court to consider the results of that investigation. For Mr. Gardner's argument in that proceeding to have meant *anything*, it must have meant that, after the funded investigation was complete, he was entitled to judicial review of the results of the investigation. Nevertheless, we need not determine whether Mr. Gardner's current argument merely recasts an argument that this court has already considered and rejected. Even accepting Mr. Gardner's current characterization of this claim, he could have raised it in his second state petition for post-conviction relief.

¶ 70 The distinction that Mr. Gardner suggests makes his current claim different from claims previously addressed by this court is

that, the last time we examined this issue, the evidence that he urges us to review did not exist. He argues that, now that the evidence has come into existence, it is a violation of due process for the evidence to go unconsidered.

¶ 71 We are not persuaded by this argument. The evidence Mr. Gardner relies on was adduced during the 1999 evidentiary hearings before the magistrate judge. By the time he filed his second state petition for post-conviction relief, this evidence had been at his disposal for more than six months. Thus, Mr. Gardner could have included this claim in the post-conviction petition for relief that he filed in state court while his corresponding federal claim was held in abeyance. That petition was filed on May 12, 2000, and did not raise the issues presented here.[211] For purposes of the PCRA, Mr. Gardner could have, but did not, seek relief in that proceeding on the grounds that he raises in the petition being considered here. Because he did not, his claims are now barred.

¶ 72 Mr. Gardner argues that his claims arose only very recently and that they therefore could not have been raised in any prior proceeding. According to Mr. Gardner, his claims are based on the fact that no court has given full and fair consideration to the evidence raised in the 1999 hearing. This argument is unpersuasive for two reasons. First, the federal district court and the magistrate judge both thoroughly reviewed this evidence in the context of Mr. Gardner's ineffective

filed his First Amended Petition for Writ of Habeas Corpus in April 2000). When the district court found that Mr. Gardner had not exhausted his state remedies with regard to the jury instruction claim, the court held Mr. Gardner's claim in abeyance while he pursued his post-conviction petition for relief in state court. *See Gardner v. Galetka*, 2007 WL 1071398, at *3, 2007 U.S. Dist. LEXIS 25651, at *10. Invoking these same procedures would likely have led to timely and appropriate consideration of his due process, equal protection, and cruel and unusual punishment claims during the course of Mr. Gardner's federal habeas corpus action.

But we need not consider whether the federal habeas corpus action also qualifies as any prior proceeding in which Mr. Gardner could have raised his grounds for relief. *See* Utah Code Ann. § 78B–9–106(1)(d) (2008). Under the PCRA, it is the State's burden to raise "any

ground of preclusion." *Id.* § 78B–9–105(2). The State has not argued that the federal habeas corpus proceedings are a proceeding in which Mr. Gardner could have raised his claims. Because the grounds of preclusion argued by the State are sufficient, we do not address this potential alternative basis for concluding that Mr. Gardner's claims are barred.

208. *See Gardner v. Galetka*, 2004 UT 42, ¶¶ 5, 13, 94 P.3d 263.

209. *Id.* ¶ 13.

210. *See Gardner v. Holden*, 888 P.2d 608, 622–23 (Utah 1994).

211. *See Gardner v. Galetka*, 2004 UT 42, ¶ 13, 94 P.3d 263.

assistance of counsel claims.[212] Each of those judges considered the evidence to the full extent urged by Mr. Gardner, and each of those judges concluded that the evidence did not establish that Mr. Gardner's trial or appellate counsel's performance had prejudiced him. These conclusions echoed the conclusion we reached in Mr. Gardner's first state petition for post-conviction relief. There we concluded that Mr. Gardner was not entitled to funding to develop that evidence because he had failed to show that "he could not adequately pursue his habeas claims" without the funding he desired to compile this evidence.[213] The federal district court and the magistrate judge reached essentially the same conclusion when they each concluded that no prejudice resulted from the fact that the new evidence was not presented to the jury. The key difference between our holding and the conclusions of the federal district court and magistrate judge is that their conclusions were based on independent review of all of the evidence adduced at Mr. Gardner's federally funded evidentiary hearing.

¶ 73 Mr. Gardner argues that the effect of this review was undermined because of the standard of review mandated by the federal Anti-terrorism and Effective Death Penalty Act.[214] The AEDPA requires federal courts reviewing state court post-conviction proceedings to determine only whether the state court's application of federal constitutional law is unreasonable.[215] Because the Tenth Circuit employed that standard of review, Mr. Gardner asserts that its decision effectively nullified the consideration given to the evidence by the lower federal courts. And since the Tenth Circuit decision was not issued until June 2009, Mr. Gardner argues he had no way of knowing until that date that the evidence would not be satisfactorily reviewed. Mr. Gardner argues that the issue is further complicated by the fact that, on appeal to the Tenth Circuit, the State stipulated to permitting the Tenth Circuit to

review the evidence de novo.[216] And since the federal district court had given this evidence full consideration in the context of Mr. Gardner's claims of ineffective assistance of counsel, Mr. Gardner argues that it was unexpected that the Tenth Circuit would not undertake the same kind of review.

¶ 74 All of these points relate to the second reason we are unpersuaded by the argument that Mr. Gardner could not have raised his claim until after federal appellate review was completed. The Tenth Circuit employed the AEDPA standard of review, mandated by federal law, because it was reviewing our decision regarding ineffective assistance of counsel.[217] The reason it examined the effectiveness of counsel is that Mr. Gardner raised a claim of ineffective assistance of counsel in his federal habeas corpus petition. That claim was presented to the federal district court in the first instance, and was reviewed by the Tenth Circuit. Had Mr. Gardner raised his due process claim before the federal district court, then both the federal district court and the Tenth Circuit would have had an opportunity to determine precisely the issue presented here—whether the Due Process Clause requires nondeferential review of the evidence developed at the federal hearing even though other constitutional guarantees do not.

¶ 75 But those courts were not presented with a claim that a different constitutional right, separate and apart from the right to effective assistance of counsel, mandated de novo review of the evidence. Mr. Gardner presented his claims to the federal courts only in the context of his ineffective assistance of counsel claims. Because Mr. Gardner did not raise this due process issue, the Tenth Circuit had no chance to consider it except as part of its analysis of the appropriate standard of review. And even when the standard of review issue was being argued before the Tenth Circuit, counsel for Mr.

212. *See Gardner v. Galetka,* 2007 WL 1071400, at *3–4, 2007 U.S. Dist. LEXIS 25643, at *9–13; Magistrate Report, *supra* note 4, at 74–116.

213. *Gardner v. Holden,* 888 P.2d at 622–23.

214. *See* 28 U.S.C. § 2254(d).

215. *See Gardner v. Galetka,* 568 F.3d at 877–83.

216. *Id.* at 877–80.

217. *Id.*

Gardner did not argue that the Due Process Clause would be offended by application of the deferential AEDPA standard. The fact that the Tenth Circuit did not review Mr. Gardner's claims with an eye toward due process requirements is a result of his failure to bring a due process claim, not an event that triggers the existence of the claim. We do not accept the notion that the Tenth Circuit's failure to consider this evidence is a predicate fact without which Mr. Gardner could not have raised this claim.

¶ 76 Because Mr. Gardner became aware of this evidence in 1999, he had an opportunity to raise issues related to the evidence in his second state petition for post-conviction relief. Because he did not do so, his claims are now precluded by the procedural bar of the PCRA. From this conclusion, it necessarily follows that Mr. Gardner's due process claims are also precluded by the limitations bar of the PCRA. That is, because the claims could have been raised in 2000, they also could have been raised more than one year before Mr. Gardner filed this petition. Thus, even if Mr. Gardner's claims were not precluded by the procedural bar of the PCRA, his claims are nonetheless barred on the independent ground that they are untimely. We conclude that the district court did not err in determining that review of Mr. Gardner's due process claims is precluded by the PCRA.

B. *Mr. Gardner's Equal Protection Claims Are Barred Because They Could Have Been, but Were Not, Asserted During His Second State Petition for Post-conviction Relief or at Any Time After the 1997 Enactment of the Statute That Forms the Basis of His Claim*

■ ¶ 77 The claims that Mr. Gardner asserts under the Equal Protection Clause of

the United States Constitution and the uniform operation of laws clause of the Utah Constitution are barred because they could have been raised at any time after 1997, including in the context of his second state post-conviction proceedings. As discussed, the PCRA bars review of claims that could have been raised in a prior post-conviction proceeding.[218] And the PCRA bars as untimely any claim that is not raised within one year of the date on which the petitioner knew, or should have known, of the facts underlying the claim for relief.[219] Both of these bars operate to preclude review of Mr. Gardner's equal protection claims.

¶ 78 Mr. Gardner's equal protection claims [220] are based on statutory enactments that occurred after the resolution of his first state post-conviction petition. In 1997, the Utah Legislature enacted Utah Code section 78–35a–202.[221] This provision provides a mechanism for counsel to be appointed to assist petitioners in post-conviction death penalty proceedings.[222] The statute also provides funding for appointed counsel.[223] Because Mr. Gardner's first post-conviction proceedings were concluded prior to the enactment of this law, he did not receive funding under this statute.[224] As a result of the timing of these events, Mr. Gardner argues that the state has arbitrarily denied him funding while providing it for individuals whose post-conviction petitions were filed after 1997 and that this discriminatory treatment has had the effect of denying him the right to full judicial review of his mitigation evidence. Mr. Gardner suggests that this alleged discrimination can be remedied if this court undertakes independent review of the evidence to determine if its unavailability

**218.** Utah Code Ann. § 78B–9–106(1)(d).

**219.** *Id.* § 78B–9–107(1) to –107(2)(e).

**220.** For purposes of this opinion, we refer to Mr. Gardner's claims under both the Equal Protection Clause of the United States Constitution and the uniform operation of laws clause of the Utah Constitution as "equal protection claims."

**221.** Act of March 7, 1997, ch. 76, § 2, 1997 Utah Laws 280.

**222.** Utah Code Ann. § 78B–9–202(2) (2008). This section of the code was modified and renumbered in 2008. It is now codified at Utah Code sections 78B–9–201 to –202. The substantive modifications to the amendment are not at issue in this case. Accordingly, we cite to the most recent version of the statute.

**223.** *Id.* § 78B–9–202(3).

**224.** *See Gardner v. Holden,* 888 P.2d 608, 622–23 (Utah 1994).

at the penalty phase of Mr. Gardner's trial was prejudicial.

¶ 79 We conclude that, because the statutory provisions underlying Mr. Gardner's claims came into effect in 1997, these claims could have been raised at that time. Specifically, the statute that Mr. Gardner alleges has created the discriminatory classification was passed in 1997 and became effective in May of that year.[225] Therefore, the legal and factual basis for Mr. Gardner's equal protection claims existed at that time. Further, Mr. Gardner has not argued that he was not aware of, or should not have been aware of, the statutory scheme on which his equal protection claims are based. Thus, these claims are untimely by virtue of the fact that they were not raised until the current petition for post-conviction relief was filed in April 2010. Under the PCRA, Mr. Gardner had until May 1998—one year after the allegedly discriminatory statute went into effect—to raise these claims. Because he did not raise the claims prior to the termination of this limitation period, his claims are precluded by the limitations bar set forth in the PCRA.

¶ 80 Mr. Gardner argues that these claims are not barred for the same reason that his due process claims should not be procedurally barred—he could not have known that he would suffer an injury as a result of this discriminatory classification until after the Tenth Circuit unsatisfactorily reviewed the relevant evidence. For the same reasons that the final unfavorable federal court review was not a necessary predicate to Mr. Gardner's due process claims, it is also not a necessary predicate to his equal protection claims. In his federal court proceedings, Mr. Gardner did not raise the claim that equal protection guarantees require full review of his mitigation evidence. The fact that the Tenth Circuit did not undertake such a review is the consequence of his failure to raise the claim, not the factual predicate that gave rise to the claim.

¶ 81 In addition to our conclusion that these claims are precluded by the limitations bar of the PCRA, we also conclude that they are procedurally barred because Mr. Gardner could have raised his equal protection claims in a prior post-conviction proceeding. As discussed, in May 2000, Mr. Gardner filed his second state petition for post-conviction relief.[226] In that petition, he sought review of his trial counsel's failure to object to a jury instruction regarding the word "knowingly." Although the statute that permits funding for post-conviction counsel had been effective for more than three years, he did not challenge the allegedly discriminatory nature of the statute at that time. Because these claims could have been, but were not, raised in this prior post-conviction proceeding, even if they were not untimely, we are precluded by the procedural bar of the PCRA from considering them. Accordingly, we hold that the district court did not err in determining that Mr. Gardner's equal protection claims are barred by the PCRA.

C. *Mr. Gardner's Cruel and Unusual Punishment Claims Are Barred Because They Could Have Been, but Were Not, Asserted During His Second State Petition for Post-conviction Relief, or at Some Time More Than One Year Before the Filing of This Petition*

¶ 82 Mr. Gardner is precluded from arguing that the length of time that has passed between his sentencing and execution constitutes cruel and unusual punishment. As with the other claims advanced by Mr. Gardner, we are willing to accept for the sake of argument that the claims could not have been raised on direct appeal, or even in his first state petition for post-conviction relief. But as discussed, the PCRA bars Mr. Gardner's claims if they could have been raised in any previous request for post-conviction relief,[227] or if they were not filed within one year after the date on which Mr. Gardner knew or should have known of the

225. *See* Act of March 7, 1997, ch. 76, § 2, 1997 Utah Laws 280.

226. *See Gardner v. Galetka*, 2004 UT 42, ¶ 5, 94 P.3d 263.

227. *See* Utah Code Ann. § 78B–9–106(1)(d).

evidentiary facts underlying the claim.[228] We conclude that the claim could have been raised prior to Mr. Gardner's second state petition for post-conviction relief and that, because it was not raised at that time, it is now barred.

¶ 83 Mr. Gardner argues that the prohibitions against cruel and unusual punishment contained in both the United States and Utah Constitutions make it unconstitutional to carry out his death sentence given the lengthy period of time that has elapsed since his initial sentencing. Mr. Gardner's claim, commonly referred to as a *Lackey* claim,[229] is premised on dual notions—that an execution carried out nearly twenty-five years after the imposition of a death sentence advances no valid theory of punishment and that, for death-row inmates, the anxieties generally associated with incarceration are amplified, which in turn makes any instance of delay inordinately punitive. We have rejected this sort of claim in the past[230] and have not been directed to a single case granting relief on this basis.[231] Nevertheless, Mr. Gardner urges us to look at the specific facts of this case, chiefly the fact that he has been incarcerated for nearly twenty-five years, in considering whether his execution has been delayed for so long that

---

**228.** *See id.* § 78B–9–107(2)(e).

**229.** *See Lackey v. Texas*, 514 U.S. 1045, 115 S.Ct. 1421, 131 L.Ed.2d 304 (1995) (Stevens, J., statement respecting denial of certiorari). We have already denied such claims in two separate cases. *See State v. Lafferty*, 2001 UT 19, ¶¶ 135–39, 20 P.3d 342; *State v. Andrews*, 843 P.2d 1027, 1030–31 (Utah 1992). Although we did not, in the cases in which we previously considered this issue, refer to the claims as "*Lackey* claims," given its now-common usage we refer to the claims as such in this opinion.

**230.** *See Lafferty*, 2001 UT 19, ¶¶ 135–39, 20 P.3d 342; *Andrews*, 843 P.2d at 1030–31. In *Lafferty*, the petitioner's claim was based on a fourteen-year period of incarceration. *Lafferty*, 2001 UT 19, ¶ 135, 20 P.3d 342. As will be discussed below, we conclude that Mr. Gardner could have raised his claim after having been incarcerated under a sentence of death for fourteen years. So, if *Lafferty* stands for the proposition that fourteen years of incarceration is simply not enough to state a *Lackey* claim, then *Lafferty* would also support the argument that the claim was not available to Mr. Gardner until after a longer period of time had elapsed. *Lafferty* does not stand for that proposition, and is therefore not inconsistent with our holding in this case.

In *Lafferty*, our decision rested on the merits of the petitioner's claim. *Id.* ¶¶ 135–39. More specifically, it rested on the petitioner's failure to present any authority to persuade us that " 'a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.' " *Id.* ¶ 136 (quoting *Knight v. Florida*, 528 U.S. 990, 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (Thomas, J., statement concurring in denial of certiorari)). As to the potential claim under the federal constitution, we expressed no opinion on the overall duration that might support such a claim.

Examining the claim under the Utah Constitution, our decision rested on a review of the proportionality of the sentence to the crimes of which the petitioner had been convicted. *Id.*

¶¶ 137–39. Under this proportionality review, our decision was based on the specific relationship between the term of incarceration imposed upon, and the crime committed by, the petitioner in that case. *Id.* Thus, rather than being inconsistent with our decision in this case, *Lafferty* establishes that such a claim *may* be raised after fourteen years and that, when the merits of that claim are reviewed, its viability will be established based on the facts of the case at hand.

**231.** The courts in cases to which we have been directed, and the cases that we have found, have uniformly rejected *Lackey* claims. *See Thompson v. Sec'y for the Dep't of Corr.*, 517 F.3d 1279, 1283–84 (11th Cir.2008); *Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir.2007) (citing *White v. Johnson*, 79 F.3d 432, 436–40 (5th Cir.1996)); *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *Chambers v. Bowersox*, 157 F.3d 560, 568–70 (8th Cir.1998); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir.1995); *Turner v. Jabe*, 58 F.3d 924, 930–31 (4th Cir.1995); *Selsor v. Workman*, No. 01–CV–0721–CVE–TLW, 2009 WL 3233806 at *44–45, 2009 U.S. Dist. LEXIS 93348 at *128–29 (N.D.Okla. Sept. 29, 2009); *Ex Parte Bush*, 695 So.2d 138, 140 (Ala.1997); *State v. Schackart*, 190 Ariz. 238, 947 P.2d 315, 336 (1997); *Hill v. State*, 331 Ark. 312, 962 S.W.2d 762, 766–67 (1998); *People v. Anderson*, 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d 347, 389–90 (2001); *Porter v. State*, 653 So.2d 374, 380 (Fla.1995); *People v. Simms*, 192 Ill.2d 348, 249 Ill.Dec. 654, 736 N.E.2d 1092, 1141–42 (2000) (trial counsel not deficient for failing to raise a *Lackey* claim because of the "lack of support" for such a claim); *Bieghler v. State*, 839 N.E.2d 691, 696–98 (Ind.2005); *Jordan v. State*, 786 So.2d 987, 1028 (Miss.2001); *State v. Smith*, 280 Mont. 158, 931 P.2d 1272, 1287–88 (1996); *State v. Moore*, 256 Neb. 553, 591 N.W.2d 86, 93–95 (1999); *State v. Chinn*, C.A. Case No. 16206, 1997 WL 464736, at *1–2, 1997 Ohio App. LEXIS 3614, at *3–5 (Ohio Ct.App. Aug. 15, 1997); *Stafford v. State*, 899 P.2d 657, 659–60 (Okla. Crim.App.1995); *State v. Austin*, 87 S.W.3d 447, 485–86 (Tenn.2002).

it is now unconstitutional to carry out his sentence.

¶84 Implicit in Mr. Gardner's *Lackey* claim is that such a claim cannot be raised until shortly before execution because it is only then that the full consequences of the passage of time can be ascertained.[232] We reject this proposition for two reasons. First, it invites endless delay, because it would essentially mandate that review be postponed until the eve of execution. The review being sought would, of course, not be instantaneous. And because the review would take time, when the review had concluded, the petitioner would be able to assert a new *Lackey* claim based on the new, even longer, amount of time that the petitioner had been incarcerated.

¶85 It is for this reason that some courts considering the merits of *Lackey* claims have disposed of the claims on the ground of waiver. That is, because executions are delayed as a result of a petitioner's decision to invoke legal process, it is incongruous to hold that the time consumed by that process makes the petitioner's sentence unconstitutional.[233] For *Lackey* claims not to undermine the death penalty altogether, it is

crucial that such claims fully ripen at some point prior to the last day before execution.

¶86 This underscores the other reason why we find Mr. Gardner's characterization of the claim untenable. The second reason that a *Lackey* claim exists prior to the eve of execution is that it is not dependent on the final number of years that have passed. The basis of such a claim, as it has been presented to us, is two-fold: the anxiety that goes along with being incarcerated while awaiting execution is uniquely harmful, and the state interests that otherwise support imposition of the death penalty become increasingly attenuated as time goes by. Accepting, for the sake of argument, that this can form the basis of a claim of cruel and unusual punishment, these facts are apparent prior to the issuance of a warrant of execution. At some point, the harms asserted in a *Lackey* claim obtain constitutional significance so that the claim can be raised. As the Ninth Circuit has observed, after this point, "the steady and predictable passage of time" may strengthen a *Lackey* claim, but it is "irrelevant to ripeness."[234] Accordingly, we reject the proposition that Mr. Gardner could not have raised his *Lackey* claim until after the signing of his most recent death warrant.[235]

---

**232.** Mr. Gardner relies on the statement made by Justice Stevens, with Justice Breyer concurring, in conjunction with the denial of certiorari in *Johnson v. Bredesen*, —— U.S. ——, 130 S.Ct. 541, —— L.Ed.2d —— (2009). Those statements indicate that at least two Justices of the United States Supreme Court believe that *Lackey* claims "should ... not accrue until an execution date is set." *Id.* at 544 (Stevens, J., statement respecting denial of certiorari). The statements made by two Justices in conjunction with a denial of certiorari do not carry the force of law. As discussed below, we join those courts that have rejected the argument that such claims ripen only on the eve of execution.

**233.** *See Johns v. Bowersox*, 203 F.3d 538, 547 (8th Cir.2000) ("Although [the petitioner] was entitled to make the motion and amend his federal petition, he cannot now claim that the delay caused by his actions constitutes cruel and unusual punishment."); *Richmond v. Lewis*, 948 F.2d 1473, 1491–92 (9th Cir.1991) (A petitioner "should not be able to benefit from the ultimately unsuccessful pursuit of [his constitutional] rights."); *see also Andrews v. Shulsen*, 600 F.Supp. 408, 431 (D.Utah 1984), *aff'd* 802 F.2d 1256 (10th Cir.1986) (The procedures that led to delay in executing the petitioner "serve[d] the important state interest of keeping the post con-

viction process moving forward at the same time it preserve[d] petitioner's due process rights.... To accept petitioner's argument would create an irreconcilable conflict between constitutional guarantees and would be a mockery of justice.").

**234.** *Allen*, 435 F.3d at 957–58.

**235.** *See id.* (holding *Lackey* claim barred under the AEDPA as a successive habeas corpus petition because the petitioner could have raised the claim in prior petitions filed, respectively, when incarceration had persisted for six or nine years—the claim did not become ripe only after fourteen years).

The *Allen* court was far from alone in rejecting the notion, proposed by Justice Stevens in his statement in *Johnson*, 130 S.Ct. at 544, that such claims should not accrue until after the signing of a warrant of execution. *See Chambers*, 157 F.3d at 568–69 (holding that petitioner's failure to raise his *Lackey* claim on direct appeal or in his prior post-conviction proceedings barred consideration of the claim in his federal habeas corpus action); *Fearance v. Scott*, 56 F.3d 633, 636–37 (5th Cir.1995) (holding that failure to raise *Lackey* claim in proceedings prior to his third federal habeas corpus action constituted an abuse of the writ).

**1144**

¶ 87 This alone does not resolve the issue before us. We must determine not merely whether Mr. Gardner could have brought his *Lackey* claim sooner than he did, but whether he could have raised it more than one year sooner than he did, or in a prior post-conviction proceeding. To make this determination, the State argues that we may look to May 2000, when Mr. Gardner filed his second state petition for post-conviction relief.[236] Because we find that Mr. Gardner's claim could have been filed at that time, we need not ascertain precisely what minimum period of time must pass before a *Lackey* claim becomes ripe for judicial resolution.

¶ 88 One component of Mr. Gardner's *Lackey* claim relates solely to the amount of time he has spent incarcerated under a sentence of death. At the time Mr. Gardner filed his second state petition for post-conviction relief, he had been incarcerated for more than fourteen years. The other component of Mr. Gardner's claim is that the mitigation evidence that was developed over time undermines the retributive purpose of punishing him.[237] He argues that testimony indicating that some of his victims would not have desired to see him executed, along with the mitigating evidence that he argues demonstrates his reduced culpability, tends to prove that the state's interest in retribution is diminished. This evidence was known to Mr. Gardner when he filed his second state petition for post-conviction relief. Further, we have no doubt that any harm that Mr. Gardner alleges is endured uniquely by death-row inmates surely would have become apparent to him during his first fourteen years of incarceration. And to the extent that the passage of time naturally creates an attenuation between the purposes of punishment and the punishment itself, we are satisfied that Mr. Gardner also could have raised a claim based on this attenuation in May 2000. Accordingly, we conclude that Mr. Gardner could have raised his *Lackey* claim in his second state petition for post-conviction relief and that, because he did not, the procedural bar of the PCRA precludes review of this claim.

¶ 89 Our conclusion that Mr. Gardner's *Lackey* claim is procedurally barred leads us to the conclusion that it is also untimely because it could have been raised more than one year ago. The petition being considered here was filed on May 4, 2010. Thus, for Mr. Gardner's claim to be timely under the PCRA, Mr. Gardner must demonstrate that the relevant evidentiary facts remained unknown to him until after May 4, 2009. But by that time, Mr. Gardner had known for nearly a decade of the evidence that, he contends, demonstrates that the state has a diminished interest in retribution. And by May 2009, the nature of his incarceration had been known to him for more than two decades. We are satisfied that any *Lackey* claim presented by Mr. Gardner accrued prior to that date. Thus, even if Mr. Gardner's claims were not precluded by the procedural bar, the claims are independently barred by the limitations provision of the PCRA because they could have been raised prior to May 2009. Accordingly, we hold that the district court did not err in concluding that the PCRA precludes review of Mr. Gardner's claims regarding cruel and unusual punishment.

---

Notably, a warrant authorizing the execution of Mr. Gardner was signed in 1996, but was stayed pending resolution of Mr. Gardner's federal habeas corpus action. Under the characterization of the accrual date advanced by Justice Stevens in *Johnson*, it is not entirely clear that Mr. Gardner's claim did not arise at that time. Given the conclusions we reach, we need not examine the nuances of a *Lackey* claim filed in a case where multiple death warrants have been issued.

**236.** Because we conclude that Mr. Gardner could have raised his *Lackey* claim in his second state petition for post-conviction relief, we need not address whether he also could have raised the claim in his first state post-conviction petition.

**237.** Although we do not reach the merits of Mr. Gardner's *Lackey* claim, we note that the Ninth Circuit has rejected such a claim by a petitioner who

"claim[ed] that it would be cruel and unusual punishment in violation of the Eighth Amendment to execute him after he [had] resided on death row for over fourteen years, [had] produced additional mitigation evidence that was not introduced at trial and [had] shown that he [was] not a threat to society."

*LaGrand v. Stewart*, 170 F.3d 1158, 1160 (9th Cir.1999).

## II. THE DISTRICT COURT CORRECTLY DECLINED TO REACH THE MERITS OF MR. GARDNER'S CLAIMS BECAUSE NO EXCEPTION THAT MIGHT PERMIT REVIEW OF THOSE CLAIMS WOULD APPLY IN THIS CASE

■ ¶ 90 Mr. Gardner argues that we have the authority, rooted in the Utah Constitution and common law, to apply exceptions to the procedural and limitations bars of the PCRA. In so arguing, he relies on a number of our decisions relating to post-conviction petitions for relief. In these cases, all of which were decided prior to recent amendments to the PCRA and to the Utah Rules of Civil Procedure relating to the PCRA, we referred to the constitutional underpinnings of our authority to apply judicially created exceptions to procedural rules in the context of post-conviction petitions.[238] Most recently, in the 2007 decision in which we address the federal district court's certified question in Mr. Gardner's federal habeas corpus action, we addressed the extent of this authority: "It has long been our law that a procedural default is not always determinative of a collateral attack on a conviction where it is alleged that the trial was not conducted within the bounds of basic fairness or in harmony with constitutional standards."[239] Mr. Gardner relies on our prior statements to argue that the Utah Constitution confers on this court authority, which cannot be displaced by statute, to examine the merits of a claim that is otherwise procedurally barred.

¶ 91 This issue arises from modifications to the PCRA that took effect in 2008 and related amendments to the Utah Rules of Civil Procedure.[240] Prior to 2008, the PCRA was "a substantive legal remedy" for a petitioner challenging a conviction or sentence; after 2008, it explicitly designates itself as the "sole legal remedy."[241] The older version of the PCRA included an exception to the procedural bar for cases where the "interests of justice" require a court to "excuse a petitioner's failure to file" within the necessary time period.[242] That exception has been replaced by a provision that tolls the limitations period, in part, "for any period during which the petitioner was prevented from filing a petition due to state action in violation of the United States Constitution, or due to physical or mental incapacity."[243] We noted in *Peterson v. Kennard,* that these amendments "appear[ ] to have extinguished our common law writ authority."[244]

¶ 92 In 2009, we amended Rule 65c of the Utah Rules of Civil Procedure to "set[ ] forth the manner and extent to which a person may challenge the legality of a criminal conviction and sentence" in post-conviction proceedings.[245] Prior to these amendments, the rules permitted "[a]dditional claims relating to the legality of the conviction or sentence" to be raised "in subsequent proceedings" if the petitioner could show "good cause" for not including the claim in prior proceedings.[246] Under the prior version of the rule, we held that this exception related to our constitutional authority to grant relief in cases of obvious injustice.[247] This exception

**238.** *See, e.g., Gardner v. Galetka,* 2007 UT 3, ¶ 20, 151 P.3d 968; *Menzies v. Galetka,* 2006 UT 81, ¶ 62, 150 P.3d 480 ("A post-conviction proceeding is a proceeding of constitutional importance, over which the judiciary has supervisory responsibilities due to our constitutional role."); *Tillman v. State,* 2005 UT 56, ¶¶ 21–23, 128 P.3d 1123; *Gardner v. Galetka,* 2004 UT 42, ¶ 15, 94 P.3d 263; *Hurst v. Cook,* 777 P.2d 1029, 1033 (Utah 1989) ("Quintessentially, the Writ belongs to the judicial branch of government.").

**239.** *Gardner v. Galetka,* 2007 UT 3, ¶ 17, 151 P.3d 968 (internal quotation marks omitted).

**240.** The amendments to Utah Rule of Civil Procedure 65C are referred to in the advisory committee notes as the "2009 amendments," even though they became effective in January 2010.

To avoid confusion, we refer to them in the same manner as the advisory committee notes.

**241.** *Compare* Utah Code Ann. § 78-35a-102 (1996) *with* Utah Code Ann. § 78B-9-102 (2008).

**242.** *Id.* § 78-35a-107(3) (1996).

**243.** *Id.* § 78B-9-107(3) (2008).

**244.** 2008 UT 90, ¶ 16 n. 8, 201 P.3d 956.

**245.** Utah R. Civ. P. 65C(a) (2010).

**246.** Utah R. Civ. P. 65C(c) (2008).

**247.** *See Tillman v. State,* 2005 UT 56, ¶¶ 20–22, 128 P.3d 1123.

was removed as a result of the 2009 amendments.[248] The advisory committee notes that accompanied those amendments state that their purpose was to "embrace [the PCRA] as the law governing post-conviction relief."[249]

¶ 93 In the time since these amendments, we have not examined whether the PCRA and Rule 65c now wholly accommodate the full measure of our constitutional authority or whether the Utah Constitution requires that we be able to consider, in some cases, the merits of claims otherwise barred by the PCRA. Nor have we examined what the parameters and scope of that authority might be under the new statutory and rules regime. The State acknowledges that this court retains constitutional authority, even when a petition is procedurally barred, to determine whether denying relief would result in an egregious injustice. Specifically, the State argues that "the PCRA's restrictions on the availability of post-conviction review are not an unconstitutional encroachment into any constitutionally based judicial authority ... because [Rule 65c] demonstrates that [the court] has adopted [the PCRA procedural and time bars] as controlling in the majority of cases." But the State also argues that we need not address this question, which has clear constitutional implications, because regardless of the boundaries of this court's authority to apply an exception to the procedural rules of the PCRA, Mr. Gardner has failed to prove that any such exception would apply to him. This argument is in accord with our obligation to "avoid addressing constitutional issues unless required to do so."[250]

¶ 94 We conclude that we need not here define the full extent of our authority to remedy an egregious injustice, because whatever the extent of that authority might be, Mr. Gardner has failed to persuade us that we ought to invoke it in this case. Our prior

decisions on this point have made it clear that a petitioner must persuade the court that, given the combined weight of the meritoriousness of the petitioner's claim and the justifications for raising it late, the interests of justice require the court to apply an exception to procedural rules.[251] Similarly, the "good cause" exception has been available only to petitioners who have demonstrated that " 'an obvious injustice' " would result unless the court reviews the merits of the petitioner's claims and that it would be " 'unconscionable' not to reexamine the issue."[252]

¶ 95 Even if we were to accept Mr. Gardner's argument that these exceptions as we articulated them prior to the recent modifications to the PCRA and to Rule 65C have not been altered by those modifications, we conclude that the exceptions would not be available to Mr. Gardner in this case. The arguments offered by Mr. Gardner in support of applying these exceptions do not persuade us that any injustice, let alone an egregious injustice, will result from our decision not to examine the merits of his claims. As discussed above, Mr. Gardner has failed to show that his claims were unavailable prior to the time that he filed this action. Moreover, multiple federal courts have examined the evidence he seeks to have us examine. All of those courts found either that the evidence would not have altered the outcome of his sentencing or that this court was not unreasonable in concluding that Mr. Gardner could show no prejudice as a result of being denied the opportunity to present this evidence.

¶ 96 Review of Mr. Gardner's case has been ongoing for nearly twenty-five years, during which time great caution and care have been exercised by multiple courts in order to safeguard his rights. In that time, Mr. Gardner has appeared before this court six times. Given the facts of this case, all of the procedures Mr. Gardner has had an op-

---

**248.** *See* Utah R. Civ. P. 65C (2010).

**249.** Utah R. Civ. P. 65C (2010) advisory committee note.

**250.** *See State v. Anderson*, 701 P.2d 1099, 1103 (Utah 1985).

**251.** *See, e.g., Adams v. State*, 2005 UT 62, ¶ 16, 123 P.3d 400.

**252.** *Gardner v. Galetka*, 2007 UT 3, ¶ 17, 151 P.3d 968 (quoting *Hurst*, 777 P.2d at 1035); *see also Kell v. State*, 2008 UT 62, ¶¶ 23–24, 194 P.3d 913 (declining to invoke good cause exception where petitioner offered "no explanation at all for why" his claims were not brought in a prior proceeding).

portunity to invoke, and the nature of the claims he raises now, we are satisfied that no injustice will result from our decision not to resolve his petition based on the merits of his claims.

¶ 97 We have thoroughly reviewed the arguments set forth by Mr. Gardner and the authority presented to support those arguments. We do not answer the constitutional question the parties raise, because regardless of the scope of this court's authority to apply an exception to the procedural and limitations bars of the PCRA, we would nevertheless decline to exercise that authority in this case. Therefore, while we do not address the district court's analysis of our constitutional authority, we affirm its judgment. The district court did not err in basing its decision on the fact that Mr. Gardner's claims are both untimely and procedurally barred under the PCRA.

## CONCLUSION

¶ 98 The district court did not err in granting summary judgment in favor of the State. All of the claims Mr. Gardner raises in his most recent petition for post-conviction relief are claims that he could have raised more than a decade ago. Under the PCRA, these claims are barred. We have reviewed Mr. Gardner's contention that this court may set aside the procedural rules of the PCRA in the interests of justice and are unpersuaded that the interests of justice require us to engage in the scope of review that he requests. Throughout the lengthy course of this case, multiple courts, including this one, have endeavored to scrupulously ensure that Mr. Gardner's rights are protected. We are firmly convinced that he has been treated justly and fairly. Accordingly, we affirm the decision of the district court.

¶ 99 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Judge DAVIS concur in Associate Chief Justice DURRANT's opinion.

¶ 100 Utah Court of Appeals Judge JAMES Z. DAVIS sat.